**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| **IN RE:** ) | |
| ) | **Case No. 26-30968** |
| **AMERICAN EFFICIENT LLC, et al.,**[1] ) | |
| ) | **Chapter 11** |
| Debtors. ) | |
| ) | |

**DECLARATION OF RICHARD A. DROM**

I, Richard A. Drom, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I earned my law degree from the University of Southern California Law Center in 1980. I have practiced energy law for more than 45 years, the last 29 of them focused on regulated wholesale electric utilities. From January 1997 to April 2002, I served as the first General Counsel of PJM Interconnection, L.L.C. ("PJM"), where I was also a Vice President and the Corporate Secretary. I then represented other electricity clients as outside counsel, including the Midcontinent Independent System Operator ("MISO") from 2002 to 2014. At MISO, I helped build its wholesale electricity markets and its Capacity tariff language. I also filed MISO's Energy Efficiency Resources ("EER") tariff provisions and obtained the Federal Energy Regulatory Commission's approval of them.

---

[1] The debtors in this case, along with the Debtors' case numbers, are: (i) American Efficient LLC, Case No. 26-30968; (ii) Affirmed Energy LLC, Case No. 26-30969; (iii) American Efficient Origination LLC, Case No. 26-30970; and (iv) Midcontinent Energy LLC, Case No. 26-30971. On July 22, 2026, Debtors filed American Efficient LLC; Affirmed Energy LLC; American Efficient Origination LLC; and Midcontinent Energy LLC's Motion for Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion") [ECF 5]. Under the Joint Administration Motion, the Debtors ask the Court to jointly administer the cases under the lowest case number and that all court papers pertaining to that administration be filed under the above used caption.

2.      I am outside counsel to the debtors in these cases (the "Debtors"). My practice focuses on Federal Energy Regulatory Commission ("FERC") matters, Regional Transmission Organizations ("RTOs"), and Independent System Operators. Since 2014, I have represented American Efficient LLC and its predecessor companies.

3.      My work for the Debtors has centered on PJM's rules. PJM is the grid operator for a large part of the eastern United States, and its FERC-approved Tariff is its official rulebook. My focus has been the Tariff provisions governing how EERs participate in PJM's Capacity Market — the marketplace in which Load Serving Entities buy the assurance they need to meet future demand. Capitalized terms in this Declaration are used as they are defined in PJM's FERC-approved Tariff.

4.      I am generally familiar with the Debtors' operations and the events leading to these Chapter 11 cases. I submit this Declaration in support of the Debtors' motions. Unless I state otherwise, everything in this Declaration comes from one or more of four sources: my personal knowledge, my review of the relevant documents, my conversations with the Debtors' advisors, and my experience with the Debtors' business.

5.      The Debtors spent nearly a decade building and running what I understand to have been the largest independent aggregation of EERs in the United States. They did so entirely inside a federal regulatory system — one that FERC created and authorized PJM to run. PJM carefully examined the Debtors' EERs, and rejected any that fell short of its Tariff standards, and approved the rest. Based on its review of the Debtors' EERs, PJM approved Affirmed Energy's participation in over twenty-five capacity auctions, over more than a decade.

6.      The Debtors now face a FERC assessment of approximately $1.1 billion in civil penalties and disgorgement — which I understand to be the largest in FERC's history. That

assessment rests on two asserted requirements, which FERC's April 15, 2026 Order Assessing Penalties, American Efficient, LLC, et al., 195 FERC ¶ 61,043 (2026) (the "Penalty Order") calls "causation" (or "additionality") and end-use customer "consent." I have worked with RTO tariffs for decades, including as the lawyer who drafted and filed MISO's EER tariff provisions. These purported "causation" and "consent" requirements appear nowhere in the EER provisions of the PJM Tariff, nowhere in PJM's posted Manuals regarding EERs, and nowhere in any governing document under which the Debtors — or any other EER provider, utility or merchant — qualified their resources.

7.     To explain how a company operating inside a federal agency's regulatory framework came to face the largest penalty in that agency's history, this Declaration proceeds in three parts. Part I explains how this part of the electricity system works: what EERs are, how PJM's Capacity Market works, what PJM does, and what role FERC plays. Part II describes the business the Debtors built inside that regulated system, and the compliance record on which they built it. Part III describes what happened: the FERC investigation, the freeze on the Debtors' collateral, and the events that led to this filing.

8.     Two facts frame the relief that the Debtors seek. First, since July 2023, PJM has held approximately $135 million of the Debtors' Capacity Market collateral and related funds. For nine consecutive years before that, PJM returned this same kind of collateral within two business days of request, once performance was confirmed. PJM has made no monetary claim of its own against these funds. Second, everything else turns on the allegations in the FERC enforcement matter, which culminated in the Penalty Order that no court has ever evaluated, and that rests on requirements appearing in no FERC-approved document. The Debtors did not file

3

these cases because their business failed. They paused their operations to survive this dispute, and these cases provide the path to preserve the company.

## PART I — HOW THE WHOLESALE ELECTRICAL SYSTEM WORKS

### A. Energy Efficiency Resources Are a Grid Resource

9.  The electricity grid needs three things to run: generation facilities (power plants such as natural gas, nuclear, or solar); transmission facilities (the high-voltage lines that carry electricity long distances); and distribution facilities (the local wires that deliver electricity to homes and businesses). The grid carries electricity across state lines, making the wholesale sale and transmission of that electricity interstate commerce, which FERC regulates under the Federal Power Act. See 16 U.S.C. § 791a et seq.

10.  FERC is the independent federal agency that regulates the interstate transmission and wholesale sale of electricity. PJM operates under FERC's authority. PJM's Tariff, its rulebook for markets and operations, is subject to review and approval by FERC. FERC also oversees how PJM carries out that Tariff. When I refer to "the Tariff" or "the rules" in this Declaration, I mean this FERC-approved body of regulation.

11.  Keeping the grid reliable is one of FERC's principal responsibilities. That includes making sure that the grid can handle its single highest hour of demand for electricity each year. Picture the hottest afternoon of summer: air conditioners across an entire region run at full blast and demand hits its peak. At moments like that, the grid needs enough generating capacity and transmission capability on hand to meet that peak. If it does not, the grid fails, and "rolling blackouts" follow — planned cutoffs that ration electricity to protect the rest of the system. Most of the Capacity that keeps the lights on comes from electric power plants that feed

electricity into the grid when PJM, or another RTO, dispatches them under FERC-approved tariff rules.

12.     A key part of PJM's Tariff authorizes it to run a Capacity Market. That market lets Load Serving Entities — the electric utilities that sell power to homes and businesses — buy enough Capacity through periodic auctions. PJM compensates Resources that commit, by contract, to have Capacity ready when PJM calls on them to produce a certain amount of electricity needed by the grid. This is how PJM ensures that its system can reliably meet demand for electricity at all times.

13.     There is a second way to meet peak demand — one that does not require building more power plants. Every unit of electricity in the grid that nobody uses is a unit that generators never have to make. A more efficient light bulb. A better-insulated home. A more efficient motor. Each one can permanently lower the demand for electricity that the grid must serve at its peak hour. FERC decided decades ago that these confirmed reductions in electricity use, achieved through better technology, can be bundled together as EERs. Once an RTO properly qualifies them, they may be submitted as Capacity Resources into the RTO's Capacity Market auctions. FERC approved PJM's Tariff language on qualifying and admitting EERs as a Capacity Market Resource; those EER rules are found in Section L of Attachment DD-1 of the PJM Tariff.

14.     At scale, qualified EERs are a FERC-approved Capacity Resource in their own right. A verified, lasting reduction in peak electricity demand does the same job as a generator standing ready to produce power.  Put another way: a megawatt the grid does not need to supply keeps the lights on just as surely as a megawatt that must be generated. EERs need no new transmission lines, no new power plants, and no fuel, and they produce no emissions.

**B. PJM and Its Capacity Market**

15.     PJM runs the electric grid across a large stretch of the eastern United States. Its name stands for the Pennsylvania-New Jersey-Maryland Interconnection; it began in 1927 with two states, Pennsylvania and New Jersey, and Maryland joined in 1956. A map of its territory is included as Addendum A. PJM owns no power plants and no transmission lines and sells no electricity to consumers. Instead, PJM runs the wholesale competitive electricity markets, and it enforces the rules that decide who may take part in those markets and on what terms. Those rules are set out in its FERC-approved Tariff. Think of PJM as the air-traffic controller for electricity: it does not fly the planes, but it decides who flies where and when, allowing electricity to cross state lines seamlessly.

16.     Among the markets PJM runs is the Capacity Market. Its purpose is to make sure the grid will have enough Resources to meet peak demand years into the future. Well before a given Delivery Year arrives, PJM forecasts the peak demand it expects, then holds competitive auctions to lock in commitments from Resources to meet that demand. A Resource that clears the auction is paid for its commitment and must perform when PJM calls on it, or face a penalty. To back up that commitment, the Tariff requires some Resources to post cash collateral, to be returned once the RTO has assessed the Resource's performance. In effect, the Capacity Market is how Load Serving Entities pay in advance for the assurance that the lights will stay on during peak demand.

17.     The Capacity Market was built to be open to competition. Any Resource that can meet peak demand as reliably as its rivals can enter the auction and compete — whether it is a generator owned by a utility or an independent resource owned by someone else. That openness is a deliberate design choice, not a loophole. The market's premise is that competition among all

6

available Resources, incumbents and independents alike, delivers Capacity at the lowest cost —

a cost consumers ultimately pay through their Load Serving Entities. An independent Resource

that can deliver the grid's needed assurance more cheaply than the incumbents is exactly what

this design was built to invite.

18.     As described above, EERs have been permitted to participate, and get paid as, a

Capacity Resource. A company that can show verified cuts in peak demand can offer those cuts,

like EERs, as a Capacity Resource.  It gets paid for the EERs like any other Resource, subject to

conditions that the RTO imposes. Because EER savings are calculated compared to a baseline,

rather than metered at a generator's plant, the Tariff requires every EER to be documented,

reviewed, and qualified by the RTO before it can enter a Capacity Market auction. The provider

submits a detailed measurement-and-verification plan explaining how it calculates energy

savings; PJM reviews the plan and either approves or rejects the Resource's eligibility to

participate in the Capacity auction.  Through this process, PJM reviewed the Debtors' EER

resources, over more than a decade before admitting them into PJM's Capacity Market auctions.

**C. FERC Approval of EERs**

19.     FERC has recognized that energy efficiency should, "to the extent possible," "be

able to compete on an equal footing with demand response, generation, and transmission

solutions." Advanced Energy Economy, 161 FERC ¶ 61,245, at P 60 (2017). In 2009, FERC

approved the EER Tariff provisions PJM proposed, explaining that "energy efficiency is a

critical part of efficient energy markets, and should be treated comparably to other types of

resources . . . ." PJM Interconnection, L.L.C., 126 FERC ¶ 61,275, at P 130 (2009).

20.     In that same 2009 order, FERC recognized that many retail customers who install

energy-efficiency measures do not capture the capacity benefit of the resources they install, and

that PJM's proposal would allow an energy-efficiency resource to bid into the auction. Id. at P

131. In other words, FERC understood, from the beginning, the value of bundling together small

retail customers' load reductions, so that consumers who bought energy-efficient products could

reach the Capacity Market indirectly, through EER providers like the Debtors. The Debtors were

among the earliest — and one of only a handful — of merchant, non-utility EER providers in

PJM, participating under the same Tariff provisions and the same Manuals as the utility EER

providers, including, as I understand it, affiliates of large regulated electric utilities such as

Exelon and FirstEnergy.

21.    FERC enforces the statutes and rules that govern PJM's markets. Its Office of

Enforcement investigates suspected Tariff violations and, where it finds them, may seek civil

penalties. For nearly a decade, the Debtors operated inside the framework described above: they

submitted their EERs for PJM's review, built a compliance record, and met their obligations year

after year. Part II describes that business and that record. Part III describes what happened

beginning in 2021, when FERC's Office of Enforcement began investigating the Debtors'

participation in PJM's Capacity Market.

## PART II — THE BUSINESS THE COMPANY BUILT

### A. The Business Model

22.    American Efficient's business idea was simple; it just ran on a large scale.

Energy-efficient consumer products — lighting, appliances, pumps — each save small amounts

of electricity. The Debtors contractually acquired exclusive rights to those small energy savings,

gathered many of them together, measured them, and sold them as Capacity in the wholesale

electricity markets. American Efficient built and ran this business for roughly ten years.

8

23.     The Debtors obtained legal rights to the energy-efficiency attributes of products sold by national retailers and manufacturers through individual, binding, exclusive contracts. One of the Debtors, American Efficient Origination LLC (formerly Wylan Energy, L.L.C.), handled this work: acting as purchase agent for an affiliated company, Wylan Management Partners, L.L.C., it acquired the energy-efficiency attributes, and legal title to that intangible property vested in and was held by Wylan Management Partners, which provided the money to buy those rights. PJM repeatedly approved the methods used to measure the resulting energy savings, and on that basis the savings qualified as Capacity, which is measured in megawatts.

24.     Wylan Management Partners supplied the Capacity Resource to Affirmed Energy LLC, the Debtors' registered Member participant in PJM. Affirmed Energy committed and sold this Capacity through PJM's Capacity Market auctions for specific future Delivery Years. PJM's Capacity Market payments were American Efficient's main source of operating cash.

25.     The Debtors divided these functions among three separate entities on purpose. American Efficient Origination was the only entity that dealt with retailers and manufacturers, handling all acquisition of the exclusive rights to products' energy-efficiency attributes — so the Debtors' partners always faced the same counterparty, no matter where the resulting resource was later sold. Wylan Management Partners paid for the resources and held them in one place. A separate, market-facing entity sold resources into each wholesale capacity market the Debtors entered: Affirmed Energy in PJM, Midcontinent Energy LLC in MISO, and other paired entities elsewhere.[2] Each entity had one clear job — one sourced, one owned, one sold into markets. No single Debtor did all three at once.

---

[2] Until a corporate reorganization in 2016, the Debtors combined their market and procurement work inside Wylan. After that, Wylan — later renamed American Efficient Origination LLC — separately contracted for the resources, while the market-facing entities sold them. The same structure also fit the different funding arrangements the company used over time to pay for its title to the energy-efficiency attributes of products.

26.     Under PJM's Tariff, Affirmed Energy had to post cash collateral to take part in PJM's Capacity Market auctions. This collateral acted as a financial guarantee for its future Capacity commitments and was, by design, self-liquidating — meant to come back on its own. The collateral was posted in advance and returned once PJM approved the final value of Affirmed Energy's EERs, through review of a Post-Installation Measurement and Verification report submitted by Affirmed Energy in advance of the Delivery Year. Money from within the corporate group funded this collateral, including through a credit facility that has since been paid off. PJM has held between approximately $72 million and approximately $135 million of that collateral since July 2023.

27.     Addendum B is a diagram of these entities, the contracts between them, and how the underlying resources, funds, and collateral moved. The legend and notes explain each flow and the agreements behind it. The diagram is offered for illustrative purposes to help the Court understand the structure; it does not affect the terms of the underlying agreements.

**B. The Independent Model**

28.     The Debtors built their business as exactly the kind of independent resource the Capacity Market was designed to welcome. Most other EER participants in PJM's Capacity Market are electricity generators or utility companies, running demand-side or efficiency programs alongside a regulated business. American Efficient took a different approach to the same system: it operated independently and survived on Capacity Market revenue alone. That model required scale. If a home replaced its lighting and sealed drafty windows, those savings might generate about twenty-five cents a year in Capacity Market revenue. Building a business on those numbers meant working on extremely thin margins across millions of homes. That made the company very different from the regulated utilities it competed alongside. A utility

10

might pay three dollars or more to get a customer to install a single light bulb and still earn the same Capacity Market revenue the Debtors did — because state-approved distribution tariffs let the utility recover the cost of significant financial incentives from ratepayers. The Debtors, unlike the utilities, had no such subsidy available. Addendum A's second figure shows the PJM Region and the service areas of regulated utilities that likewise offered EERs as Capacity.[3]

29.     Affirmed Energy was the Debtors' PJM-registered Capacity Resource provider. It submitted EERs for review and approval in PJM's annual auctions starting in 2014. PJM's staff reviewed every submission, each backed by technical work. PJM approved Affirmed Energy's and its predecessor's (Wylan Energy, L.L.C.) eligibility to participate in over twenty-five capacity auctions, over more than a decade.[4] Starting with the 2023/2024 Delivery Year, PJM added independent third-party audits on top of its own review.

30.     For nine straight Delivery Years, the self-liquidating collateral cycle worked exactly as designed. Affirmed Energy and its predecessor, together with their banking partners, posted hundreds of millions of dollars of collateral over those years — approximately $439.8 million on the current account alone. Each time, as the Tariff required, PJM returned the collateral within two business days of Affirmed Energy's request, after PJM approved the Delivery Year performance report. Each return reset the Debtors' account to essentially zero; after the last normal return in June 2022, the balance was approximately $167,000. The Debtors took their collateral obligations seriously. Their finance team routinely worked with PJM's credit staff to fix errors in PJM's own collateral model — helping PJM match the required amounts

---

[3] The second map on Addendum A is illustrative only. It does not show any party's actual Capacity obligations.
[4] See note 2, above, regarding the 2016 reorganization.

down to the penny. The relationship was collaborative and professional, built on a decade of accurate, open dealing.

**C. The Compliance Record**

31.     The Debtors organized themselves around a consistent compliance practice. When a relevant Tariff rule was unclear, the Debtors took the question to the authority in charge of it, described its situation honestly, asked how that authority wanted the company to proceed, and then followed the answer. When an answer did not work, the company said so and tried to fix it. When it could not find a fix, it stopped. It did not "work around" problems. What follows are three examples of that practice being tested — and the paper trail each one produced.

32.     Prior to registering to participate in the PJM Capacity Market, the Debtors examined whether their business model complied with the requirements for participating in it. They acquired exclusive rights to the intangible property connected to such energy-efficient goods. When the Debtors first entered the business, a manufacturer offered them the standard industry contract used for electric-utility product promotions. That standard contract said nothing about intangible property rights and, by its terms, transferred no such rights to anyone.  Rather than rely on that form, the Debtors drafted entirely new program agreements from scratch.

33.     These program agreements changed slightly over time, but they always did four things. First, the manufacturer or retailer partner confirmed it currently held exclusive rights to the intangible property tied to a product's energy savings, free of any competing claim. Second, the partner agreed to transfer all of those exclusive rights to the Debtors. Third, the Debtors agreed to pay the partner for those rights, based on each reporting period's actual product sales in the PJM Region. Fourth, both sides agreed to indemnify each other to make sure the transfer of

rights held up. The Debtors thereby obtained the contractual authority the Tariff called for — in many cases years before anyone asked them to prove they held it.

34.     Early in the Debtors' participation in PJM's Capacity Market, PJM's staff questioned the Debtors about one of their EER calculations—specifically, the residential-lighting "coincidence factor" behind the Debtors' submissions.[5] The Debtors had measured that factor directly: an in-home light-logger study, completed in 2013 under the measurement-and-verification plan PJM had approved for that purpose, found a coincidence factor of 13.15 percent. PJM's staff observed that the figure was higher than numbers they had seen from other programs — an informal comparison, not a Tariff rule, Manual requirement, or fixed standard. Rather than force a formal dispute, the Debtors gathered independent data supporting their measurement, including a regional study their consultants reported was producing consistent results, and asked PJM to work through the issue together. PJM approved the Debtors' resources for that Delivery Year while holding its position open, and told the company to support the figure with its own primary data in its post-installation reports. The Debtors accepted that condition and met it. When PJM raised the concern again in 2019, noting the 2013 study was aging, the Debtors measured again: a new in-home light-logger study, completed in 2021, found a lower coincidence factor of 10.9 percent. The Debtors adopted the new, lower figure in their measurement-and-verification plans from then on. When the Debtors' own new study produced a number that shrank the Capacity value they could claim, they used that number. The Debtors handled this question the way they handled every hard question — by measuring, and by following what the measurement showed.

---

[5] A coincidence factor is the share of installed efficiency actually in use during PJM's peak hours. It is a key number used to calculate an EER's Capacity value.

13

35.     When a question needed outside expertise that the Debtors lacked in-house, they sought and obtained that expertise. As the regulations grew more complex, the Debtors assembled a deep team of advisors — among them Ms. Suedeen Kelly, a former FERC Commissioner who had been at FERC when it considered and approved the rules governing EERs in wholesale capacity markets. Each advisor joined because the Debtors had run into a question that only someone with that specific expertise could answer correctly. The Debtors built this compliance structure step by step, in response to problems as they arose. By the time FERC's investigation opened in 2021, the Debtors had already built the kind of record a serious review would want: written, formal, and documented at every stage.

**D. The WYLAN Questions: The 2016–2017 Written Compliance Exchange With PJM**

36.     On August 15, 2016, five years prior to the opening of the Office of Enforcement's investigation, the Debtors' President sent PJM a detailed written inquiry, addressed to Frederick S. (Stu) Bresler III, then a senior PJM markets executive, and to Paul Scheidecker, Senior Lead Engineer, Capacity Market Operations, copying PJM's RPM Hotline. It laid out eleven written questions; a twelfth carried over from a July 22, 2016 call with PJM. The goal of the inquiry was to obtain PJM's written guidance regarding compliance questions. The questions, conveyed via email to PJM's RPM Hotline — its standing channel for tariff clarification requests — covered ambiguous areas of PJM's EER rules, so the Debtors sought clarity out of an abundance of caution. The stated purpose of the email was to "confirm that Wylan's interpretation is the same as PJM's understanding of the Requirements."  PJM's response document called this inquiry the "WYLAN Questions." On August 23, 2016, Mr. Scheidecker confirmed receipt: "We're looking through these and will be back to you later shortly."

37.     The Debtors waited almost eight months for PJM's written response, but the conversation did not stop during the wait. The Debtors followed up in writing on January 9, 2017. Mr. Scheidecker replied the same day, saying he had understood the questions to have been answered "during the various calls with your team and potential bilateral counterparties during the past few months," and offering to "chronicle those discussions more formally."

38.     On January 25, 2017, Mr. Scheidecker emailed Mark Laabs, then the Debtors' Chief Operating Officer, inviting him to PJM's Valley Forge, Pennsylvania office to discuss EER matters. I set up a meeting for February 2, 2017 at PJM's offices. Attendees included Mr. Laabs, me, Mr. Scheidecker, and other PJM employees — including PJM's CEO, Mr. Andy Ott; Mr. Stu Bresler; and Mr. Christopher O'Hara, then PJM's Associate General Counsel. I also arranged for Mr. Laabs and me to meet that same day with PJM's Independent Market Monitor, Mr. Joe Bowring. At the PJM meeting, Mr. Laabs presented a PowerPoint documenting parts of the Debtors' business model. PJM's participants were encouraged to ask questions, and Mr. Laabs and I answered them. That afternoon, Mr. Laabs and I gave the same presentation to Mr. Bowring and answered his questions as well.

39.     One question that has arisen in the FERC Penalty Order is whether the Debtors needed to obtain consent of end-use customers.  The Debtors' Program Agreements did not require notice to end-use customers.  From my perspective, this made good sense.  The products involved numbered in the millions, and as described above, the Debtors obtained exclusive contractual rights to the relevant intangible property upstream — from the manufacturers and retailers of those products, rather than from end-use customers.

40.     Copies of many of the signed program agreements were given to PJM repeatedly between 2018 and 2023, as part of PJM's process for approving Affirmed Energy's EER

15

submissions. PJM understood that Affirmed Energy's Program Agreements did not include mandatory customer-notice provisions; these Agreements made clear that Affirmed was contracting with manufacturers and retailers of energy-efficient products, not end-use customers. As far as I know, PJM never raised end-use customer notice as relevant to EER qualification, and PJM never asked the Debtors to add a customer-notice provision to any program agreement.

41.     PJM's written answers to the Debtors' August 15, 2016 Hotline email arrived on April 6, 2017. Mr. Scheidecker's cover note explained the delay: "we wanted to circulate them among our various SMEs [Subject Matter Experts] to ensure a thorough and accurate response." Having served as PJM's first General Counsel, I know how PJM likely prepared a response like this: circulated among subject-matter experts across departments — often including PJM's Law Department — put in writing, and sent under a staff engineer's cover note as an institutional product. PJM took the Debtors' questions seriously, studied them for the better part of a year, and answered them deliberately.

42.     PJM added a caveat to its responses: it "does not review or endorse the internal business processes, quality or compliance controls of EE Providers," and its answers should not be read as endorsing those practices. The Debtors did not treat the responses as an outright endorsement, and neither do I. But the April 6, 2017 responses matter for what they are: PJM's own written statements of what its rules require, and of how PJM itself runs its market.  PJM's remaining answers confirmed the Debtors' practices on matters that would later resurface in an audit: that lighting baselines tied to the federal standard could be used until that standard's statutory end date, and that engineering studies performed outside PJM's territory were acceptable references in measurement-and-verification plans and reports.

16

43.     This exchange with PJM, while notable for its breadth and for being in writing, was one part of an ongoing working relationship with PJM: the July 2016 call that produced the twelfth question; the "various calls" with PJM staff and counterparties that Mr. Scheidecker himself described; the meetings held while the written response was pending; and, over the five years that followed, the Debtors' submission of roughly fifteen to twenty more measurement-and-verification plans and reports, with sample program agreements attached. I describe this exchange because it shows what a decade of steady, constructive conversation with the market operator looked like. Though I have never been the Debtors' employee, I have worked with the people who ran these companies for more than a decade. What I observed, consistently, was a company that asked its regulator first, in writing, and followed the answers it received.

**E. The Company Today and Its Future**

44.     Affirmed Energy's final Delivery Year under the current Tariff framework was 2025/2026, with Capacity revenues that ended May 31, 2026. At its peak, in the 2024/2025 Delivery Year, Affirmed Energy cleared more than 5,400 megawatts in PJM's Capacity Market — using PJM's published estimate of roughly 800 homes per megawatt, enough verified reduction in peak demand to power more than four million homes. The Debtors have not failed, and they have not closed. As this dispute drained their resources, American Efficient suspended its operations rather than ending them: it wound down active programs and shrank its team from approximately eighteen people when the business was fully operating to four by the time the Penalty Order issued. It did this to preserve resources, not to exit the business.

45.     PJM removed the EER provisions from its Capacity Market in 2024, not because the grid stopped needing the resource, but because of a flaw in the mechanism that PJM had built to accommodate it — a mechanism that had reached the point where, FERC found, EERs

17

"cannot lower the clearing price or costs paid by load." PJM Interconnection, L.L.C., 189 FERC ¶ 61,095, at P 64 (2024). Before PJM moved to end the program, the Debtors had proposed what they had urged for years: better EER rules — better measurement across all hours, technical standards published by PJM rather than dependent on each state's timeline, and a framework ensuring every megawatt in the market was genuinely new and not already counted in PJM's load forecast. The Debtors proposed a technical conference to work through these questions. After stakeholder discussions, PJM instead chose to eliminate EERs, with FERC's approval, by a Tariff amendment effective only going forward. The Debtors pursued their statutory rights to seek agency rehearing and then judicial review of FERC's orders approving PJM's Tariff amendment.  Ultimately, the United States Court of Appeals for the D.C. Circuit upheld FERC's decision in February 2026.

46.     In my view, the need for energy efficiency has only grown. PJM's own 2026 Long-Term Load Forecast projects that summer peak demand will rise by roughly 65 gigawatts over the next ten years — an increase of 65,733 megawatts, to a forecasted 222,106 megawatts by 2036 — driven by data centers and electrification, growth at a rate the PJM grid has not seen in decades. See 2026 PJM Load Forecast Report, Summer & Winter Summary (Jan. 14, 2026). As demand has outpaced new supply, PJM's auction clearing price rose roughly tenfold in two years, reaching a regulatory price cap. In my experience, well-designed EERs reduce the demand the grid must buy Capacity to cover in the first place, faster and at lower cost than any resource that can be built with today's technology. PJM removed EERs from its Capacity Market just as its markets hit the tightest supply, and the highest prices, in its history. EERs will not return to PJM's Capacity Market unless FERC restores them, and the Debtors will urge their restoration. American Efficient retains the abilities that work will require. But the Debtors cannot do that

18

work while roughly $135 million of their capital stays frozen, an unresolved penalty claim drains their ability to operate, and a fraud charge hangs over their reputation.

## PART III — WHAT HAPPENED

### A. The Investigation and the Collateral Freeze

47.    The Debtors built a documented compliance record over the course of a decade of successful operations in a regulated business.  The Debtors understood that they always needed to be ready for a regulatory audit. When FERC's Office of Enforcement issued its first document-retention hold in 2021, that record was already in place, and the Debtors expected, based on that record, to compare well against their peers. They retained a former head of FERC's own Division of Investigations to help present it to the agency.

48.    In May 2021, FERC's Office of Enforcement opened an investigation into American Efficient's participation in the wholesale capacity markets. The investigation ran for more than two years. On July 14, 2023, the Office of Enforcement issued preliminary findings accusing the Debtors of fraud and market manipulation.

49.    Those findings came from a process in which only one side could gather evidence. Under FERC's procedures, the Office of Enforcement could subpoena documents and compel testimony under oath. The Debtors could not question a single sitting PJM employee — including those employees who had reviewed and approved these resources many times. The Debtors were not able to take depositions, and they were not permitted to speak with the Commissioners or their staffs. The Debtors provided detailed responses — about the Tariff's wording, the measurement methods, and a decade of PJM approvals—but the same office that built the case against it was the only one that judged those responses. The penalty that followed

19

rests on a record only one side was permitted to build. No court has yet heard the Debtors' evidence.

50.    In my view, PJM's reaction to the Office of Enforcement's actions has an institutional explanation — one that requires attributing no unfavorable motive to PJM. In June 2018, a PJM member called GreenHat Energy LLC defaulted on its financial transmission rights positions — the largest default in the history of that PJM market — and PJM's members had to absorb approximately $179 million in shared losses. A sitting FERC Commissioner later wrote that PJM had drawn justified and widespread criticism for weak collateral requirements and oversight. PJM responded by overhauling its credit rules and creating a new Chief Risk Officer position. That overhaul gave PJM new discretion — under Attachment Q of the Tariff, PJM could declare an "unreasonable credit risk" based on factors beyond those the Tariff specifically listed, authority FERC accepted in 2020. FERC's fraud allegations arrived against that backdrop. PJM later used that authority against Affirmed Energy. PJM's stated basis for its initial refusal to return the collateral was a "Material Adverse Change," or "MAC." A MAC is a defined concept in the credit provisions of Attachment Q: a material adverse change in a member's financial condition or prospects. I am familiar with these provisions from my years of work with PJM's Tariff. A MAC determination is a credit judgment — an assessment of a member's ability to meet its financial obligations going forward. It is not a finding of wrongdoing.

51.    On April 15, 2026, FERC issued its Penalty Order, assessing against American Efficient the approximately $1.1 billion described above. That total breaks into two parts: a civil penalty of approximately $722 million — the largest in the agency's history — plus approximately $410 million in disgorgement (repayment of money already earned) of the Debtors' capacity revenues.

20

**B. The Cascade**

52.     The collateral freeze did not simply hold an asset in place. It cut the Debtors' corporate structure off from the revenue on which it depended and set off a cascade that destroyed value at every level of the business over the following three years. When PJM withheld the Debtors' cash collateral, it broke the self-repaying design of the Debtors' senior Credit Facility. That facility was normally repaid as PJM released collateral after each Delivery Year. With the releases frozen, its balance stayed high and repaying it drew on the Debtors' operating revenue instead.

**C. The Two Ratchets**

53.     A penalty of approximately $1.1 billion against what is now a four-person company — whose main business FERC had already eliminated by regulation — needs an explanation. Two instruments account for it: the civil penalty FERC assessed and the cash collateral PJM has frozen.

54.     Start with the penalty. The Office of Enforcement did not simply charge a violation of the PJM and MISO Tariffs; it charged fraud and market manipulation under the Commission's Anti-Manipulation Rule. This triggered a Base Penalty of $516,088,517 — the sum of approximately $489 million in PJM and MISO capacity revenues American Efficient had received over the life of its business and a $26,927,256 Winter Storm Elliott performance bonus, which the Order treated as the loss caused by the violations. Applying its Penalty Guidelines, the Commission assessed a civil penalty of $722,000,000.

55.     In May 2024, the Office of Enforcement provided a "1b.19" notice to the Debtors, indicating its conclusion that the company engaged in violations and its intent to recommend an enforcement proceeding. Counsel for the Debtors asked for a standard thirty-day extension to

respond. The Office of Enforcement denied the request. It is my understanding that subjects of similar investigations had taken comparable time in nearly every prior case, and no such request had ever been refused before. Counsel wrote to Enforcement leadership, copying the Chairman and the Commissioners, to explain the need. As I understand it, no response came. The Debtors took the extra thirty days and filed. The Penalty Order withheld cooperation credit under the Commission's Penalty Guidelines, which I understand to result in a higher civil penalty amount. The Commission rested that denial on the Debtors' refusal to make witnesses voluntarily available, stating that "this uncontested behavior alone" warranted withholding the credit. (Enforcement staff had separately contended that the Debtors granted themselves an unauthorized 30-day extension of a regulatory deadline, but the Commission did not adopt that as a basis for its cooperation-credit ruling.)

56.     The theory behind the penalty is one that the market operator itself has not adopted. PJM made its own filings after Enforcement staff's preliminary findings issued and before the Penalty Order. In those filings, PJM stated repeatedly that its administration of EERs was consistent with its Tariff — the same Tariff under which American Efficient participated. The penalty rests on an asserted "causation" requirement: the Office of Enforcement argued, without citing any tariff language imposing such a requirement, that EERs can qualify as Capacity Resources only if a company can prove its actions "caused" the installation of energy-efficient products. Through the date of the Penalty Order, PJM had not treated any such requirement as part of the Tariff, Manuals, or rules that PJM writes and administers.

57.     In my approximately three decades working with RTO tariffs — including drafting and filing the EER tariff provisions at MISO — I have never encountered a "causation" requirement for energy efficiency resources in any RTO tariff. Nor, in my professional

22

experience, could such a requirement be administered as written. There is no reliable way to determine why someone installed an energy-efficient product, or whether an installation would have happened anyway without a particular incentive. Consider a manufacturer's rebate on a new car: the sale might turn on the car's color, the salesperson's skill, the car's features, a neighbor's recommendation, or the simple need for a car — and the buyer may not even know the rebate exists. No RTO tariff contains the pages of detail that would be needed to spell out how an EER provider could measure causation and resolve those problems.

58.     The Office of Enforcement made a second claim: that the EERs at issue were invalid because the Debtors had not obtained the "consent" of the end-use customers who bought the energy-efficient products. It pointed to no language in the PJM Tariff supporting that claim. As described in Part II, the Debtors had contractually obtained exclusive intangible property rights to the products' energy-efficiency attributes from the manufacturers and retailers who held them, and PJM's own April 6, 2017 written response identified two ways — a sworn officer's certification or a set report statement — to confirm those rights, neither involving end-use customers. FERC identified no workable way for an EER provider to obtain knowing consent to intangible property rights from millions of retail buyers.

59.     The most developed justification PJM has ever offered for the collateral hold is an audit that PJM itself commissioned and controlled. PJM conditioned acceptance of the company's pending annual performance report for the next delivery year on resolution of a draft audit of the prior year — before the company had been heard on the draft's findings. In my time as PJM's first General Counsel, and in my years of practice since, performance review and credit review were distinct processes with distinct standards. Using an unresolved draft audit of a

23

completed year to hold up the next year's approvals — and then citing the same audit as

justification for continuing to hold collateral — is not a practice I ever encountered.

**D. Every Path Tried**

60.     The Debtors did not file these cases without first seeking relief everywhere that it

might be found. In October 2023, American Efficient wrote to the Chairman of FERC,

describing the investigation as an existential and irreparable threat to the Debtors and urging the

Commission to step in. The Commission did not act. American Efficient then asked FERC to

pause the penalty proceeding while a resolution was explored. FERC declined. In August 2025,

American Efficient and PJM jointly urged FERC to act on all pending dockets, warning that

regulatory inaction was "resulting in an escalation of risk and potential harm to both PJM and

Affirmed [Energy]." FERC did not act.

61.     The United States Court of Appeals for the D.C. Circuit reviewed FERC's

approval of the Tariff amendment that eliminated EERs — and with it, Affirmed Energy's

market participation. That Court, in a two-to-one decision, affirmed FERC's order in February

2026. That proceeding addressed only the market-wide Tariff amendment, not PJM's

withholding of Affirmed Energy's collateral.

62.     In the United States District Court for the Middle District of North Carolina, the

Debtors brought a constitutional challenge to FERC's enforcement process. Judge Schroeder

denied a preliminary injunction. That proceeding concerns only the enforcement process; the

District Court cannot order the collateral returned or value FERC's claim.

**E. The Demand and PJM's Response**

63.     On April 15, 2026, FERC acted twice in the same matter on the same day. It

issued the Penalty Order. And in a companion order, it denied the Debtors' long-pending

24

complaint seeking the collateral's return. See Affirmed Energy LLC v. PJM Interconnection, L.L.C., 195 FERC ¶ 61,044 (2026). The companion order used language suggesting a disgorgement order would create a financial obligation, and that breaching that obligation by failing to pay within 60 days "would be a default" on which PJM "could draw upon the Restricted Collateral." The next day, PJM issued a new $60 million collateral demand, based, "among other things," on "the magnitude of repayment obligations associated with capacity revenues" for the 2024/2025 and 2025/2026 Delivery Years, and on the Debtors' financial condition, "pursuant to Attachment Q" of the Tariff. The day after that, PJM revised the demand: no additional cash was required, "all existing Collateral previously posted shall remain in place," and PJM would apply earned capacity revenues — approximately $9.2 million, PJM has said — toward the demand instead.

64. Then, on June 12, 2026, the Commission acted on rehearing. Affirmed Energy LLC v. PJM Interconnection, L.L.C., 195 FERC ¶ 61,199 (2026). It struck the default-and-draw language from its April 15 order. And it clarified the timing that governs everything in this Part: the Debtors' financial obligation to pay disgorgement and penalties "will not be 'created' until the Commission, in an action to enforce the Penalty Order, secures a judgment from a federal district court." The Debtors have no obligation to pay before that judgment, and withholding payment until judgment is rendered is not a failure to comply with the Penalty Order. The Commission upheld its denial of the complaint, holding that PJM's hold remained a reasonable credit judgment under the Tariff, and declined, as premature, any question of default.

65. Here is where things stand. PJM based its post-Order demand on "repayment obligations" that, by the Commission's own clarification, do not yet exist. Throughout this

25

dispute, PJM has never invoiced a repayment obligation. It has never assessed one. It has never

identified a tariff provision under which it is owed money.

Dated: July 20, 2026
Washington, DC

_____
Richard A. Drom

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN EFFICIENT LLC, *et al.*,[1] | ) | Case No. 26-30968 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

# ADDENDA A–B TO THE
# DECLARATION OF RICHARD A. DROM

## TABLE OF CONTENTS

**ADDENDUM A**   Energy Efficiency as Capacity in PJM (Territory Map Figures) — *referenced at ¶¶ 15, 28*

**ADDENDUM B**   How the Company's Energy-Efficiency Capacity Business Operated (Schematic) — *referenced at ¶ 27*

---

[1]  The Debtors in these chapter 11 cases, together with their respective case numbers, are: American Efficient LLC (Case No. 26-30968); Affirmed Energy LLC (Case No. 26-30969); American Efficient Origination LLC (Case No. 26-30970); and Midcontinent Energy LLC (Case No. 26-30971). On July 22, 2026, the Debtors moved for joint administration of these cases under the lead case of American Efficient LLC, Case No. 26-30968.



# ADDENDUM A — Energy Efficiency as Capacity in PJM
# (Territory Map Figures)

Referenced at ¶¶ 15 and 28 of the Declaration of Richard A. Drom.

*The maps are illustrative only and do not depict any party's Capacity obligations.*

## Energy Efficiency as Capacity in PJM
### ❶ The PJM market — 13 states and the District of Columbia



▼ within PJM

### ❷ Within PJM, regulated utilities also offered energy efficiency as capacity



Within PJM, regulated electric utilities serving load across the region also offered energy efficiency as capacity during this period. American Efficient's energy-efficiency resources were dispersed across the PJM footprint rather than tied to any single utility's service territory.

🟧 **Regulated utilities that offered energy efficiency as capacity in PJM**
🟦 **PJM transmission zones**

Base map: PJM Interconnection transmission-zone map (May 2023), reproduced without modification to state or zone boundaries. Zone shading added at the direction of the declarant; illustrative only.

# B

## ADDENDUM B — How the Company's Energy-Efficiency Capacity Business Operated (Schematic)

Referenced at ¶ 27 of the Declaration of Richard A. Drom.

*Demonstrative prepared from the governing agreements and corporate records; illustrative only.*

## How American Efficient's Energy-Efficiency Capacity Business Operated

*Asset and title flow to the right; funds and capacity payments flow to the left.*



*Demonstrative prepared at the direction of the declarant from the governing agreements and corporate records; illustrative only.*