**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| IN RE: | Case No. 26-30968 |
| AMERICAN EFFICIENT LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

**DEBTORS' OBJECTION TO MOTION OF PJM INTERCONNECTION, L.L.C. AND PJM SETTLEMENT, INC. FOR ENTRY OF AN ORDER APPOINTING A CHAPTER 11 TRUSTEE, OR IN THE ALTERNATIVE, AN EXAMINER**

American Efficient LLC, American Efficient Origination LLC, Affirmed Energy LLC, and Midcontinent Energy LLC (collectively, the "**Debtors**"), respectfully submit their Objection to the *Motion for Entry of an Order Appointing a Chapter 11 Trustee, or in the Alternative, an Examiner* filed by PJM Interconnection, L.L.C. and PJM Settlement, Inc. (collectively, "**PJM**") [Dkt. 65, the "**Motion**"], and state:

## INTRODUCTION

1. Less than a month into these chapter 11 cases and on the heels of the Debtors filing suit against PJM to recover, among other amounts, approximately $10 million in preferential transfers, PJM sought the extraordinary remedy of a chapter 11 trustee. PJM's principal argument—that the Debtors engaged in prepetition misconduct—rests entirely on a Federal Energy Regulatory Commission ("**FERC**") administrative order that was not the product of an adjudicative process and is only enforceable *if* FERC is able to prove its charges in federal court after a full hearing with discovery and all of the due process rights afforded to the Debtors under the Federal Rules of Civil Procedure. *See* 16 U.S.C. § 823b(d)(3)(B); *Fed. Reg. Energy Comm'n*

[1] The Debtors in these cases, along with each Debtor's case number, are: (i) American Efficient LLC, Case No. 26-30968; (ii) Affirmed Energy LLC, Case No. 26-30969; (iii) American Efficient Origination LLC, Case No. 26-30970; and (iv) Midcontinent Energy LLC, Case No. 26-30971.

*v. Barclays Bank PLC*, 247 F. Supp. 3d 1118 (E.D. Cal. 2017) (rejecting FERC's argument that the district court's *de novo* review is limited in any way). At this point, FERC has not even filed a proof of claim let alone taken any other steps to prove its alleged claims. And PJM's Motion is not the vehicle for FERC's alleged claims to be tried. Without the FERC administrative order, which is not admissible in any event for the truth of the matters asserted therein and has no preclusive effect, PJM has nothing to support its claim of prepetition mismanagement.

2. PJM also has not identified any post-petition mismanagement. Instead, it argues that the Debtors' proposed Debtor in possession financing creates a conflict of interest because, as initially proposed, the lender would have had a lien on the proceeds of avoidance actions. Even assuming this were a valid basis for the appointment of a trustee (and it is not), the very day that PJM filed its Motion, PJM was told that the Debtors had negotiated to eliminate this provision from the proposed loan. Despite knowing that fact, PJM has not withdrawn or even modified its Motion.

3. PJM's other complaints also do not withstand scrutiny. PJM claims a trustee is required to address what it calls "creditor distrust." (Motion ¶ 26.) Yet no other creditor or party in interest, such as the Bankruptcy Administrator, has joined PJM's Motion, completely undercutting PJM's claim that creditors lack confidence in the Debtors. And this argument is suspect coming from the defendant in a $10 million preference action that has every incentive to severely delay, if not completely hobble, the prosecution of that lawsuit. PJM also argues that venue should be changed, but addressing venue does not require a trustee. PJM is free to file a venue motion any time it wants, yet it has not done so in the 59 days this case has been pending.

4. Finally, PJM's argument about why the benefits of a trustee outweigh the costs is telling. PJM argues that a trustee will be beneficial because she may independently evaluate what

litigation may be pursued. (Motion ¶ 33.) Reading between the lines, what PJM really wants is a change of the plaintiff in the adversary proceeding pending against it in the vain hope that a trustee might elect not to pursue PJM for the preferential and avoidable post-petition transfers it received. But that amounts to the use of a trustee motion as a litigation tactic by a defendant that has no standing to move for a trustee in the first place.

5. Stripped of PJM's inflammatory rhetoric, the allegations in PJM's Motion do not even come close to establishing by clear and convincing evidence that the appointment of a trustee is appropriate here. Moreover, given that PJM's only connection to these chapter 11 cases is as a defendant in an adversary proceeding it lacks standing to even bring its Motion. For these reasons, PJM's Motion should be denied.

## BACKGROUND

### A. The Debtors' Bankruptcy Cases.

6. On July 18, 2026 (the **"Petition Date"**), the above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7. Since the Petition Date, the record demonstrates that the Debtors have fully complied with all of their obligations under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. The Debtors have filed detailed Schedules and Statements of Financial Affairs on time without any extensions. [Dkt. 57.] They have attended their first meeting of creditors and answered all of the questions posed to them. They have filed their monthly operating reports. [Dkt. 94.] They have answered questions raised informally by creditors, including by PJM, and by the Bankruptcy Administrator. And they have negotiated in good faith with the Bankruptcy Administrator and others to resolve objections and answer questions about the motions they have filed. The Debtors

also filed two detailed declarations detailing their business activities and financial status [Dkt. 11, 25.]

8. The Debtors also have promptly moved to collect their assets, filing a complaint against PJM to avoid the approximately $10 million preference it received. [*See* Adv. No. 26-03055.] The Debtors have also filed a motion for sanctions against PJM because PJM has continued to take funds that PJM's own tariff treats as the Debtor's property in violation of the automatic stay. [Dkt. 75.] And the complaint also challenges the lien that PJM purports to have and seeks turnover of the balance of the funds that PJM is holding—over $130 million—once FERC's alleged claims are defeated or FERC fails to prosecute its alleged claims by the bar date.

**B. The FERC Administrative Order**

9. Prior to their bankruptcy filing, between 2014 through May, 2026, the Debtors, among other things, aggregated and provided energy efficiency resources ("**EERs**") in PJM's capacity market (which is known as the Reliability Pricing Model). During that time period, PJM's rules permitted EERs to qualify and be offered as capacity resources in Reliability Pricing Model auctions and PJM approved the Debtors' participation in those markets 38 separate times, across 26 auctions, between 2014 and 2025. From and after June 1, 2026, however, PJM no longer permits EERs to participate in the Reliability Pricing Model auctions.[2]

10. On December 16, 2024, FERC acceded to its Enforcement Staff's request to issue an order directed at Debtors American Efficient and Affirmed Energy LLC to show cause why they had not violated various sections of the PJM tariffs and the Federal Power Act. That show

[2] Affirmed Energy appealed this rule change to the United States Court of Appeals for the District of Columbia but was unsuccessful. *See Affirmed Energy, LLC v. FERC*, 166 F.4th 1070 (D.C. Cir. 2026). It has obtained an extension of time to file a petition for *certiorari* to the Supreme Court regarding the D.C. Circuit's order, with the petition now due on or before September 18, 2026. *See Affirmed Energy, LLC v. FERC*, No. 26A109 (U.S. July 24, 2026). The Debtors have retained special counsel pursuant to an order of this Court to prosecute the petition. [Dkts. 63, 68.]

cause order triggered FERC's obligation to provide notice to the Debtors that they could elect to have either an administrative law judge or a federal district court try FERC's alleged claims. *See* 16 U.S.C. § 823b(d)(2), (3). The Debtors elected to proceed in the district court, which meant that FERC was required to "promptly" issue an order assessing a penalty and then file suit in district court if it wanted to prove up its alleged claims. *Id*.

11. Despite the Debtors' election, FERC did not act promptly. Instead, it waited until April 15, 2026 to issue its administrative order assessing civil penalties and ordering disgorgement, a remedy that the Debtors dispute is available to FERC. The process by which FERC issues such an order is one-sided. There is no hearing. *See generally id*. § 1b.1 et seq. (Rules Relating to Investigations). The Debtors had no ability to take discovery, issue subpoenas for the production of witnesses or documents, or cross-examine their accusers or witnesses deposed by FERC. *Id*. § 1b.13 (giving that power only to FERC). During the course of its investigation, FERC's Office of Enforcement has had unfettered access to FERC's Chairman and Commissioners, while FERC's policies prohibit the target of an investigation from speaking directly with the Chairman, Commissioners, or their staff. *Revised Policy Statement on Enforcement*, 123 FERC ¶ 61,156 at P 27 (2008). As one court explained, "no procedural requirements apply to the order assessing penalties except that it be 'promptly assessed'" *Fed. Energy Reg. Comm'n v. Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 760 (E.D. Va. 2017) (citing 16 U.S.C. § 823b(d)(6)(A)).

12. FERC itself recognizes that its administrative order is unenforceable and may never be enforceable unless it prevails in a *de novo* hearing in district court. In another administrative order issued on June 12, 2026 FERC stated:

> *We now clarify that Affirmed's 'financial obligation' to pay disgorgement and civil penalties will not be 'created' until the Commission, in an action to enforce the*

> *Penalty Order, secures a judgment from a federal district court*. American Efficient has no obligation to pay disgorgement or civil penalties prior to that time, and thus it would not '[f]ail[] to comply' with the Penalty Order merely by withholding such payments until judgment is rendered.

*Affirmed Energy LLC v. PJM Interconnection, L.L.C.*, No. EL24-124-001, 2026 WL 1718516, at ¶ 16 (F.E.R.C. June 12, 2026) (emphasis added).

13. As of the filing of this Response, FERC has not filed a proof of claim, and it has not sought leave of this Court to institute an action in district court. Because FERC's alleged claim was scheduled as disputed and unliquidated [Dkt.57], FERC has no claim against the Debtors at this time. 11 U.S.C. § 1111(a).

**C. The Debtors' Claims Against PJM.**

14. The Debtors have brought two actions against PJM. The first is an action to recover, among other amounts, over $9 million of the Debtors' capacity revenues and over $700,000 of accrued interest that PJM seized during the 90 days before the Debtors filed for bankruptcy. As alleged in the adversary complaint, on April 16, 2026, PJM sent Affirmed Energy a letter demanding $60 million because it alleged that the Debtors were in a "weak financial condition." [*See* Adv. 26-03055, Dkt. 1, ¶ 67.] The next day, on April 17, 2026, PJM sent a second letter to Affirmed Energy stating that it was taking $9.2 million of capacity payments "otherwise payable" to Affirmed Energy to satisfy its $60 million demand. [*Id*. ¶ 68.] Between April 20, and June 15, 2026, PJM took the capacity payments and interest earned on the Debtors' funds, which amounts the Debtors seek to recover as preferential transfers. [*Id*. ¶¶ 68, 73.] In addition, the Debtors seek return of the balance of the funds that FERC is holding—over $130 million—on a number of bases, including that FERC has no security interest in the funds.

15. With respect to the withholding of capacity revenues, PJM has admitted in other proceedings that it has no authority under its tariff to withhold capacity revenues once PJM has

determined the final nominated value of the EER and accepted the Debtors' Post-Installation Measurement and Verification Report, which has happened here with respect to all of the capacity revenues that PJM is withholding. Although PJM may conduct audits, that is an after-the-fact review, and clearing the timeframe in which an audit may be instituted is not a pre-condition to payment under the tariff. (*See* PJM Comments, *Indep. Mkt. Monitor for PJM v. Indicated Energy Efficiency Sellers*, Docket No. EL24-113-000, at 13-14 (filed July 3, 2024); PJM Protest, *Indep. Mkt. Monitor for PJM v. Indicated Energy Efficiency Sellers*, Docket No. EL25-87-000, at 8-9 (filed June 27, 2025) (attached as Group Exhibit 1).)

16. The second action is a Motion for Sanctions related to PJM's willful violation of the automatic stay. [Dkt. 75.] Under PJM's own tariff, interest earned on funds held by PJM is to be paid to the market participant on a monthly basis as earned. [*See* Adv. 26-03055, Dkt. 1, ¶¶ 26-28.] After the Petition Date, PJM continued its demands for additional collateral and when those demands were not met, retained approximately $825,000 in interest earned on the Debtors' funds post-petition which, pursuant to PJM's tariff should have been paid to the Debtors. The adversary complaint seeks turnover of these funds pursuant to Bankruptcy Code section 549 and the Motion for Sanctions seeks damages for PJM's willful stay violation.[3]

[3] Although PJM suggested at the DIP hearing that FERC addressed these claims, that is not so. The adversary complaint and sanctions motions both raise unique bankruptcy claims under 11 U.S.C. §§ 362, 544, 547, 549 and 550 that were not and could not have been addressed in any matter pending before FERC and over which only a court sitting in bankruptcy has jurisdiction to decide. *See Energy Dev. Corp. v. Cabot Oil & Gas Corp.*, No. 2:04-0862, 2005 WL 8159335, at *2 (S.D. W. Va. Mar. 15, 2005) (a '"critical predicate"' for applying claim preclusion in the Fourth Circuit is that the prior court could have adjudicated all theories of recovery; holding a FERC order dismissing a complaint filed by the plaintiff which was also bringing common law claims in federal court was not entitled to *res judicata* effect in the federal court case).

## ARGUMENT

17. “The appointment of a trustee in a chapter 11 case is an extraordinary remedy, and there is a strong presumption in favor of allowing the debtor to remain in possession.” *In re Bergeron*, 2013 WL 5874571, at *6 (Bankr. E.D.N.C. Oct. 31, 2013) (collecting cases). “Because the appointment of a trustee should be the exception, rather than the rule, the movant must demonstrate by clear and convincing evidence, the grounds for appointment of a trustee under both subsections of § 1104(a).” *Id.*; *accord In re Bayou Group, LLC,* 564 F.3d 541, 546-47 (2d Cir. 2009) (“‘[t]he standard for § 1104 appointment is very high …’”); *In re G-I Holdings, Inc.*, 385 F.3d 313, 320 (3d Cir. 2004) (“the party asking for the appointment of a trustee bears the burden of persuasion by clear and convincing evidence”); *see also* H.R. Rep. No. 95-595, at 233 (1977)). PJM has acknowledged this burden. (Motion ¶ 22.)

18. In its Motion, PJM claims that both grounds for appointment of a trustee under section 1104(a) exist. PJM alleges that cause exists under section 1104(a)(1) to appoint a trustee primarily because it contends that the FERC administrative order establishes that the Debtors have engaged in “fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor.” (Motion ¶¶ 19-24.) Alternatively, PJM argues that a trustee should be appointed because “such appointment is in the interests of creditors, any equity security holders, and other interests of the estate.” (Motion ¶¶ 28-34.) As an initial matter, the Court should deny PJM’s Motion because it lacks standing to bring it. But to the extent that the Court reaches the merits, as set forth below, PJM does not come close to establishing by clear and convincing evidence that it has met either standard.

### I. PJM Lacks Standing to Prosecute its Motion.

19. PJM’s only connection to this case is as a defendant in an adversary proceeding. It has not filed a claim, and any claim it would file would be subject to disallowance pursuant to 11

U.S.C. § 502(d) because PJM has received voidable transfers of estate property and not returned those transfers to the estate. Because PJM's only nexus to these bankruptcy cases is its status as a defendant in an adversary proceeding, PJM lacks standing here. *See In re Richardson Foods, Inc.*, 659 B.R. 154, 164 (Bankr. S.D.N.Y. 2024) (holding that a defendant in an adversary proceeding did not have standing to move to dismiss the bankruptcy case). As the Court explained in *Richardson Foods*, granting a defendant in an adversary proceeding standing '"would lead to the illogical result of catapulting [the defendant] to standing above the Debtors and their estate creditors."' *Id*. at 165 (quoting *In re Manshul Constr. Corp.*, 223 B.R. 428, 431 (Bankr. S.D.N.Y. 1998).

20. Bankruptcy courts recognize that if the only connection a movant has to the bankruptcy case is as a defendant, then the movant/defendant's interest in prosecuting a motion against the debtor will likely be "defensive and strategic in nature" and "intended to derail or delay prosecution of the claims against [the defendant]." *In re E.S. Bankest, L.C.*, 321 B.R. 590, 598 (Bankr. S.D. Fla. 2005) (holding adversary defendant lacked standing to bring conversion motion). In *Still v. Fundsnet, Inc. (In re Southwest Equip. Rental),* 152 B.R. 207 (Bankr. E.D. Tenn. 1992), for example, which is closely on point with the facts here, preference defendants moved to dismiss the corporate bankruptcy case on the grounds that the filing had not been properly authorized. The court concluded that the defendants lacked standing to bring their motion, holding that the defendants "want the case dismissed to protect payments they received before bankruptcy, without regard to whether dismissal will help or harm other creditors." *Id*. at 210.

21. The same is true here. PJM wants the comparable relief of a chapter 11 trustee because it wants to "protect payments it received before bankruptcy" without regard to the interests

of other creditors in seeing those payments recovered. *Id*. The Court should find that PJM lacks standing and deny its Motion.

**II. PJM Has Not and Cannot Establish by Clear and Convincing Evidence "Cause" under Section 1104(a)(1) to Appoint a Trustee.**

**A. FERC's Administrative Order Does Not Establish "Cause."**

22. PJM's primary argument is that the Court should not allow the Debtors' management to remain in possession because FERC's administrative order establishes that they committed fraud and engaged in other misconduct prepetition. (Motion ¶¶ 23-24.) According to PJM, FERC's administrative order should not be treated "as mere allegations" but instead should be treated as "formal findings" that in PJM's view compel the appointment of a trustee. (*Id*.) There are at least four problems with this argument.

**1. The Allegations in FERC's Administrative Order Are Not Findings and Are Entitled to No Weight.**

23. For starters, the United States Supreme Court has rejected PJM's argument, holding the exact opposite in a recent decision. The Supreme Court held, when assessing a nearly identical enforcement scheme under the Communications Act, that an agency's orders "do not 'settle' their recipients' legal obligations" and they do not "make any 'ultimate determination[s]' of fact." *Fed. Comm's Comm. v. AT&T, Inc.*, 608 U.S. --, 146 S. Ct. 1418, 1429 (2026). Instead, the "only legal effect" of an administrative order like the one at issue here "is to enable the [federal government] to file suit" against the recipient of the order. *Id*. Any civil suit that follows the entry of an administrative order is a trial *de novo*, which the Supreme Court explained "means a proceeding 'in which the whole case is gone into *as if no trial whatever has been had*' in the initial tribunal." *Id*. at 1428 (original emphasis). In other words, "it is as if [the agency] never found any facts at all." *Id*. at 1429. Instead, consistent with the Seventh Amendment, any "ultimate determination of

the facts giving rise to an obligation to pay" must rest with a jury and not a federal agency. *Id*. at 1430; *see SEC v. Jarkesy*, 603 U.S. 109, 117 (2024).

24. The FERC enforcement statute at issue here is in all critical respects identical to the enforcement statute at issue in *AT&T*. Both provide that the recipient of a penalty order may elect to challenge that proposed assessment in federal district court rather than before an administrative law judge, and if that election is made, the agency must prove its case *de novo* in the district court before it may enforce any penalties that the district court elects to assess. *Compare* 16 U.S.C. § 823b(d)(2), (3) and 18 C.F.R. §§ 1507, 1509 *with* 47 U.S.C. §§ 503(b)(4), 504(a).

25. District courts addressing what *de novo* review means under section 823b(d)(2) and (3) of the Federal Power Act have long made this same point. In *Powhatan Energy Fund,* 286 F. Supp. 3d at 760 and *Barclays Bank*, 247 F. Supp. 3d at 1134-37, for example, district courts presiding over FERC enforcement actions held that the defendants who elected district court *de novo* review of FERC's administrative orders were entitled to take discovery, that the Federal Rules of Evidence would apply at trial, and that "'[b]y definition, de novo review entails consideration of an issue as if it had not been decided previously.'" *Powhatan Energy Fund*, 286 F. Supp. 3d at 762 (quoting *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 246 (4th Cir. 2009)).[4]

26. PJM's contrary argument—that this Court should treat the FERC administrative order as "formal findings" and not as "mere allegations"—cannot be squared with the Supreme Court's precedent in *AT&T* and *Jarkesy* or lower court precedent interpreting the scope of *de novo*

[4] *Accord Fed. Energy Reg. Comm'n v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 197 (D. Mass. 2016) ("[t]he court's reading of the statutory language, bolstered by FERC's prior pronouncements, the approaches of other courts, and the requirements of due process, leads the court to conclude that Option 2's *de novo* review means treating this case as an ordinary civil action governed by the Federal Rules of Civil Procedure that culminates, if necessary, in a jury trial"); *Fed. Energy Reg. Comm'n v. City Power Mktg., LLC*, 199 F. Supp. 3d 218, 232 (D.D.C. 2016) ("In sum, the Court will treat this case like a normal civil action governed by the Federal Rules.").

review under 16 U.S.C. § 823b(d)(2) and (3). A comparison of PJM's argument with the different outcomes in *Jarkesy* and *AT&T* makes this point. In *Jarkesy*, the Supreme Court ruled that the SEC's enforcement regime under the Dodd-Frank Act violated the Seventh Amendment because it allowed the SEC to impose civil penalties for fraud "through its own in-house proceedings." *Id*. at 118, 120-21. In *AT&T*, the Supreme Court held that the FCC's enforcement regime did not violate the Seventh Amendment or conflict with its holding in *Jarkesy* because the defendant had the right to demand a *de novo* trial by jury in an Article III court and the agency's determinations were not binding or enforceable unless and until the agency proved its case before a jury. 146 S. Ct. at 1430. In other words, an agency violates the Constitution if its in-house enforcement process purports to allow the agency to make binding factual determinations and to enforce civil penalties.[5]

27. Even FERC itself is not making the argument that PJM asserts here. In a subsequent order, FERC made clear that it does not believe its administrative order establishes anything until it proves its case in federal court. FERC stated: "Affirmed's 'financial obligation' to pay disgorgement and civil penalties *will not be 'created'* until the Commission, in an action to enforce the Penalty Order, secures a judgment from a federal district court." *Affirmed Energy LLC*, No. EL24-124-001, 2026 WL 1718516, at ¶ 16 (F.E.R.C. June 12, 2026) (emphasis added). FERC's use of the term "created" is telling; it acknowledges that FERC's administrative order establishes absolutely nothing other than FERC's right to sue the debtor Affirmed Energy and prove its case (if it can) in federal court.

[5] When the Debtors challenged the constitutionality of FERC's enforcement procedures on largely the same grounds later decided in *AT&T*, the district court declined to enjoin FERC from assessing penalties against the Debtors because, as the Supreme Court later ruled in *AT&T*, any assessed penalties would be unenforceable and subject to *de novo* review in a federal district court. *See American Efficient LLC v. Fed. Energy Reg. Comm'n,* No. 1:25-cv-68, 2025 WL 3268367, at *5, 9-12 (M.D.N.C. Nov. 24, 2025).

28. The only authority that PJM cites in support of its argument that the allegations in the FERC administrative order are "formal findings" entitled to "*res judicata*" effect is *United States v. Utah Construction & Mining Co.,* 384 U.S. 394 (1966). (Motion ¶¶ 8, 30 & n.3.) *Utah Construction* is readily distinguishable because, for among other reasons, it was decided under the Wunderlich Act, 41 U.S.C. § 321, which expanded the grounds on which contractors could seek judicial review of administrative decisions deciding government contract disputes. Government contract disputes, however, are unique because of the United States' sovereign immunity, which allows the United States as the sovereign to decide when and how it can be sued.

29. Apart from that critical distinction, the language from *Utah Construction* that PJM relies upon actually establishes that the FERC administrative order is *not* entitled to *any* preclusive effect. Specifically, the *Utah Construction* Court noted in *dicta* that "[o]ccasionally courts have used language to the effect that *res judicata* principles do not apply to administrative proceedings, but such language is certainly too broad." 384 U.S. at 421-22. Instead, the Court noted that *res judicata* may apply "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate…." *Id*. at 422.

30. In this case, FERC never acted in a "judicial capacity." It is undisputed that the Debtors elected to require FERC to prove its case *de novo* in the district court. FERC's administrative order also was the product of a one-sided investigation where only FERC could subpoena witnesses or require production of materials, 18 C.F.R. § 1b.13, and where only FERC's enforcement staff could communicate with the commissioners—the individuals who decide whether to assess a penalty, *Revised Policy Statement on Enforcement*, 123 FERC ¶ 61,156 at P 27 (2008).

31. More fundamentally, because FERC's alleged claims against the Debtors are all legal in nature, the Debtors are entitled to a trial by jury. *See Am. Eff.*, 2025 WL 3268367, at *7-9 (holding that FERC's claims are all legal in nature). For this reason, (i) the Seventh Amendment, (ii) Supreme Court precedent, (iii) the text of FERC's enforcement statute, and (iv) even FERC's own stated views about the import of its administrative order dictate that this Court cannot, as PJM argues, treat the allegations in FERC's administrative order as "formal findings" or give them any weight at all. Instead, they are nothing more than "mere allegations, which are contested" and as such they "are not sufficient to warrant appointment of a trustee." *Bergeron*, 2013 WL 5874571, at *7 (collecting cases). As the bankruptcy court in *Bergeron* explained, even a criminal indictment (which FERC's administrative order is not) is not sufficient by itself to establish cause to appoint a trustee. *Id*. at *8. The same is true here: the FERC administrative order does not constitute cause to appoint a trustee.

**2. The Statements Made in FERC's Administrative Order Constitute Inadmissible Hearsay and Should Not Be Considered at the Hearing on PJM's Motion.**

32. The second problem with PJM's attempt to convert FERC's administrative order into "formal findings" is that this order is not admissible to prove the truth of the matters asserted therein. Instead it is rank hearsay—an out of court statement offered to prove the truth of the matters asserted therein—and thus it is inadmissible. Fed. R. Evid. 801(c), 802.

33. No exception to the hearsay rule applies here. PJM may argue that Rule 803(8)(A)(iii) applies. That rule provides an exception for the admission of public records containing the "factual findings from a legally authorized investigation." But *AT&T* forecloses that argument. Following *AT&T*, FERC's administrative order must be treated "as if [the agency] never found any facts at all." 146 S. Ct. at 1429. Because FERC's administrative order finds nothing, it

cannot be characterized as the "the factual findings from a legally authorized investigation," a predicate for admission under Rule 803(8)(A)(iii). *See also Smith v. Isuzu Motors*, 137 F.3d 859, 862 (5th Cir. 1998) (holding that preliminary findings "do not reflect 'factual findings' of [the agency]") (collecting cases); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1140 (5th Cir. 1983) (noting that "[i]f the [agency report] is not sufficiently final, it may not constitute a 'factual finding,' or may be considered untrustworthy, under the exception to the hearsay rule in Fed. R. Evid. 803(8)(C)").

34. But even if the statements in FERC's administrative order could be classified as "factual findings," an investigative report of an agency is still not admissible if "the source of information or other circumstances [surrounding the report] indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Reports that are not final lack trustworthiness. *See Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 101, 109 (E.D. Va. 2004) ("[i]n light of the nonfinal and appealable nature of the [FTC order], the [FTC order] is not the type of document subject to admission under Rule 803(8)(c)") (collecting cases). FERC's administrative order is not final in any sense of the word given that Supreme Court precedent dictates it should be treated "as if [the agency] never found any facts at all." 146 S. Ct. at 1429. Therefore, the FERC administrative order is not trustworthy and it cannot be admitted into evidence, leaving PJM with no proof to support its claim of prepetition misconduct.[6]

**3. PJM's Motion Is Not the Vehicle to Try FERC's Allegations.**

35. PJM's Motion also is not the proper vehicle to try FERC's allegations. When and if FERC elects to file a proof of claim and otherwise prosecute its claim for penalties, the Debtors

[6] PJM's counsel has stated that he does not intend to call any witnesses to support his Motion and that he intends to offer only the FERC administrative order and some of the Debtors' filings in this Court to support its Motion. (*See* Exhibit 4 hereto.)

will establish that their actions fully complied with PJM's tariff and with FERC's regulations. PJM's tariff authorized the Debtors to aggregate EERs and treat them as capacity resources in FERC's capacity auctions. PJM approved the Debtors' participation in these auctions for twelve years and continued to approve the Debtors' participation even after PJM was aware of FERC's investigation and allegations. PJM was fully aware of the Debtors' business model and never objected to it. FERC's late-breaking disagreement with the Debtors' longstanding business model does not transform the Debtors' actions into market manipulation or fraud.

36. But all of these arguments should wait until later in the case. For present purposes, *Jarkesy* and *AT&T* forbid the Court from treating FERC's findings as substantive evidence of misconduct—and because PJM's Motion rests on the view that those findings *should* be treated as substantive evidence of misconduct—PJM's Motion should be denied.

#### 4. PJM's Primary Reliance on the Debtors' Alleged Prepetition Misconduct Is Misplaced.

37. Finally, PJM's emphasis on the Debtors' alleged prepetition conduct as a basis to conclude that the Debtors cannot be trusted to act as debtors in possession is misplaced. While the statute permits consideration of prepetition conduct, courts are reluctant to remove management based solely on allegations of prepetition misconduct. *See Bayou Grp.*, 564 F.3d at 547 n.3 (noting that the focus is on post-petition conduct of current management). Instead, the "focus is on the debtor's current activities, not past misconduct." *Bergeron*, 2013 WL 5874571, at *7 (collecting cases).

38. The Fourth Circuit takes the view that even in cases of serious and proven post-petition misconduct (which is not the case here), that "current management should be permitted to identify and correct its past mistakes." *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 241 (4th Cir. 1987). In *A.H. Robins*, the parties moving for a trustee proved

that the debtors' management made post-petition payments on account of prepetition claims for the benefit of their insiders, employees, and creditors without court approval. Nonetheless the Fourth Circuit affirmed the bankruptcy court's decision not to appoint a trustee even though it "recognized that Robins' conduct was improper and warranted a civil contempt sanction." *Id*. at 242.

39. If violating Code provisions post-petition to benefit favored insiders and creditors was not a sufficient basis on which to appoint a trustee in *A.H. Robins* because a debtor "should be permitted to identify and correct its past mistakes," then allegations of prepetition misconduct that have never been proved and are contested also should not be a basis to conclude these Debtors cannot be trusted to serve as debtors in possession. *A.H. Robins*, 828 F.2d at 241.[7]

**B. PJM Has Not and Cannot Establish that the Debtors Have Engaged in Any Post-Petition Misconduct.**

40. Tacitly recognizing that its arguments about prepetition misconduct will not carry the day, PJM attempts to gin up a number of alleged post-petition concerns that it argues justify the appointment of a trustee. Each of these arguments also lack merit.

**1. The DIP Facility Does Not Create a Conflict of Interest.**

41. PJM contends that the proposed DIP facility, which this Court has already approved on an interim basis over PJM's objection [Dkt. 92], demonstrates that the Debtors have a conflict

[7] PJM's cites *Gomez v. U.S. Trustee*, No. 7:09cv00496, 2010 WL 582706 (W.D. Va. Feb. 18, 2010) and *In re Piedmont Ctr. Invs., LLC*, No. 11-06178-8-JRL, 2011 WL 5903398 (Bankr. E.D.N.C. Sept. 8, 2011) for the proposition that prepetition dishonesty justifies the appointment of a trustee. (Motion ¶ 22.) But in *Gomez*, the district court stated that the "mere existence of a prior felony conviction will not justify the appointment of a trustee in every Chapter 11 case." 2010 WL 582706, at *2. In *Piedmont Center*, the bankruptcy court stated that it would not appoint a trustee based upon the indictment of the debtor's principal; instead it appointed a trustee, for among other reasons, because the debtor's principal wrote a letter to his wife providing "a detailed, twenty-one step list, explaining how to financially maximize his 'death,'" which he planned to fake. 2011 WL 5903398, at *2, 4. Nothing remotely like the facts of *Gomez* or *Piedmont Center* is present here.

of interest which justifies the appointment of a trustee. (Motion ¶ 25.) According to PJM, this alleged conflict arises because, as originally proposed, the DIP facility would have granted the Debtors' indirect parent MIH LLC ("**MIH**") a lien on the proceeds of avoidance actions. (*Id.*) But the Debtors removed this request from the financing motion and no longer seek this relief. PJM's counsel was told about this modification on the very day that PJM filed its Motion, yet PJM has not amended or withdrawn its Motion.

42. The fact that the Debtors made this modification to the DIP facility demonstrates that Debtors' management is performing its fiduciary duties. At the initial hearing on the DIP facility, Tayler Dalpe testified that while the DIP loan is nominally being made by the Debtors' indirect parent, MIH, the real party on the other side of the negotiations was a non-insider lender, EIG Management Company, LLC ("**EIG**"). (*See* Exhibit 5 (8/21/26 Tr.) at 16:1-21.) As Ms. Dalpe testified, EIG is the real lender here because it holds a lien on MIH's cash and because the loan was in default, EIG was in a position to exercise its rights under its lending agreement with MIH. (*Id*. at 17:10-18.) Thus, MIH needed EIG's consent to make a loan to the Debtors. Before these cases were filed, EIG refused to agree to the use of its cash collateral to make the DIP loan if the Debtors did not request that MIH be given a lien on the proceeds of avoidance actions. (*Id*. at 25:18-26:3.) Throughout the negotiations, the Debtors tried to dissuade EIG from making this demand and when they could not do so, the Debtors took the position that they expected EIG to withdraw this demand if the Bankruptcy Administrator or others objected.

43. The Bankruptcy Administrator objected, and the Debtors repeated their demand to EIG that it withdraw its request for a lien on avoidance actions. Ultimately EIG agreed. Thus, contrary to the picture that PJM attempts to paint, the Debtors were not asking to grant MIH a lien on avoidance actions to protect MIH from potential claims. A third-party, non-insider lender to

MIH made this demand, and the Debtors, consistent with their fiduciary duties, ultimately succeeded in getting that lender to back down. (*Id*. at 25:18-26:3.)

44. Further, even if there was not a true third-party, non-insider lender behind the DIP loan, there is nothing inherently suspect about an insider loan. Insider DIP lending is often necessary where conventional financing is unavailable, particularly in a litigation-heavy case such as this. *See, e.g., In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 776 (Bankr. S.D.N.Y. 2020) (approving insider DIP facility over objections and noting that there were no better financing alternatives). PJM itself conceded that no alternative lender was available, stating the Debtors "would have had difficulty obtaining funding from a non-insider" and their "equity holders likely are the only source for the litigation financing the Debtors are seeking." [Dkt. 59 ¶ 33.] Having acknowledged that no outside financing was available, PJM cannot credibly argue that the Debtors' decision to obtain financing from the only available source constitutes mismanagement or bad faith.

45. Moreover, the Debtors have been fully transparent with all parties and the Court about the proposed debtor in possession loan and the related Transaction Support Agreement. The Dalpe Declaration also explained the terms and the insider relationship with MIH. Ms. Dalpe also testified for over an hour on August 21, including about the structure and provisions of the Transaction Support Agreement, which contains all of the agreements between and among the Debtors, MIH, related entities, and EIG. (*See generally* Ex. 5 (8/21/26 Transcript) at 15:9-32:12.)

46. The Debtors responded to and satisfied the concerns of the Bankruptcy Administrator, by removing the requests for liens on avoidance actions and the proceeds thereof, omitting waivers of marshalling, and adding reporting covenants in favor of the Bankruptcy Administrator and any creditors' committee. [*See* Dkts. 71, 73.] The Bankruptcy Administrator

withdrew her objection [Dkt. 78], and the DIP Facility was approved over PJM's objection on an interim basis [Dkt. 92].

47. The Debtors also attempted to negotiate with PJM before that hearing, but PJM did not engage. The Debtors notified PJM when they reached an agreement with the Bankruptcy Administrator to see if those agreements would address PJM's objections. PJM said no and offered no additional concessions that would satisfy it. Although PJM argued at the interim DIP hearing that it lacked basic information like the loan agreement between EIG and MIH, those statements were not true. The only time that PJM has asked for information, via an email on July 25, 2026, the Debtors provided the majority of the requested documents on July 27. The documents the Debtors provided to PJM included the lending agreement between EIG and MIH called the Note Purchase Agreement (*see* Exhibits 2-3 hereto.), which PJM's counsel erroneously led the Court to believe at the DIP Financing hearing that no one had seen (*see* Exhibit 5 hereto (8/21/26 Tr.) at 82:8-23; 91:21-25). The two requested documents that were not available on July 27—the DIP Credit Agreement and the proposed approval order—were filed on the docket with the changes requested by the Bankruptcy Administrator before the August 21 hearing and were in PJM's hands sufficiently before the August 21 hearing for PJM to review them. [Dkts. 73-74.] This transparent and good-faith process demonstrates the Debtors' fitness to continue serving as debtors in possession.

**2. The Fact that this Case Involves Liquidating Substantial Causes of Action is not Cause to Appoint a Trustee.**

48. PJM also implies that there is something inherently suspect about a liquidating chapter 11 and argues that because creditor recoveries may depend upon, among other things, litigation against PJM itself, a trustee is required. But this argument proves too much. Displacing Debtors' management with a trustee who knows nothing about the causes of action against PJM

will only serve to increase costs and delay recoveries. And while that may serve PJM's interests as a defendant, it certainly does not serve the interests of other creditors, equity holders, and other parties in interest.

49. Moreover, if FERC actually presses its claims, Debtors' management would be in the best position to defend the claim most efficiently, which again would benefit all of the creditors other than PJM. Courts have refused to appoint a trustee in liquidation cases when appointment of a trustee will only delay the case and burden it with additional expense. *Bayou*, 564 F.3d at 547 (declining to appoint a trustee where management had filed 125 adversary proceedings).

50. PJM's arguments that a case that involves the liquidation of substantial litigation claims is inherently suspect also is wrong. In *G-I Holdings*, the Third Circuit affirmed the bankruptcy court's denial of a trustee motion even though the debtor was a holding company engaged only in managing asbestos claims. 385 F.3d at 316, 321. Moreover, courts have held that reorganization cases that feature significant related or collateral litigation are a proper bankruptcy purpose. *In re Greg Adams Enters., Inc.*, No. 10-09784-8-SWH, 2011 WL 5909505, at *3 (Bankr. E.D.N.C. May 2, 2011); *In re SPAC Recovery Co.*, 676 B.R. 708, 718-22 (Bankr. S.D.N.Y. 2026). And liquidation is recognized in sections 1123 and 1129 of the Bankruptcy Code as a proper purpose for a chapter 11 case. 28 U.S.C. § 1123(b)(4) ("a plan may ... provide for the sale of all or substantially all of the property of the estate ..."); 28 U.S.C. § 1129(a)(11) ("Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."). It also is well settled that chapter 11 may be used to facilitate the orderly liquidation of assets. *See, e.g., 1500 Mineral Spring Associates, LP v. Gencarelli*, 353 B.R. 771, 781 (D.R.I. 2006) ("Filing a chapter 11 petition in order to liquidate all

of the debtor's assets does not constitute bad faith, per se, because chapter 11 is not limited to the attempted reorganization of a business."); *In re Cred Inc.*, 2023 WL 2245371, at *1 (Bankr. D. Del. Feb. 27, 2023) ("Chapter 11 also contemplates the possibility that it would be used to facilitate an orderly liquidation that maximizes creditor recoveries").

51. In support of its contrary argument, PJM cites *In re TP, Inc.*, 455 B.R. 455 (Bankr. E.D.N.C. 2011) for the proposition that trustees are required to independently assess a chapter 11 debtor's litigation decisions. (Motion ¶ 27.) *TP* is a completely different case. There, the debtor disobeyed a bankruptcy court order to turn over certain funds to a creditor, diverted rent payments that belonged to the debtor to the debtor's principal post-petition, failed to file monthly operating reports, failed to keep estate property insured during the chapter 11 case, and failed to pay post-petition property taxes and quarterly chapter 11 fees. *Id*. at 456. The Court ordered the appointment of a trustee based upon this misconduct, not because a trustee is always required whenever a debtor raises claims against a creditor.

**3. PJM Has Not and Cannot Establish that Creditors Have Lost Confidence in the Debtors.**

52. PJM also proclaims that creditor distrust in this case "has escalated to the point that current management can no longer be relied upon to function as a fiduciary or make impartial decisions on behalf of the estate." (Motion ¶ 26.) But these cases are less than two months old. No one other than the Bankruptcy Administrator and PJM have made any substantive filings in these cases. And the Debtors promptly addressed and resolved the Bankruptcy Administrator's concerns. No creditor has joined PJM's Motion. And PJM's motives in seeking a trustee given its status as a defendant facing substantial claims are suspect.

53. There is no basis on this record for PJM to claim that this case is anything like *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463 (3d Cir. 1998), which PJM cites to support its argument

that what it calls "creditor distrust" can constitute cause to appoint a trustee. The *Marvel* case pended for a year before a trustee was appointed. During that year, two different creditor factions fought for control over the debtor's board of directors and were at an impasse as to how to move forward. *Id*. at 467-68. That acrimony, coupled with the fact that the faction currently in control over the debtor obtained that control during the chapter 11 case and thus was a "Johnny-come-lately debtor-in-possession," is what the Third Circuit held constituted cause to appoint a trustee. *Id*. at 471-72. Nothing like those facts is even remotely present here. Indeed, there are no facts to suggest that creditor acrimony requires the appointment of a trustee, and PJM has offered none.[8]

**4. PJM's Other Complaints Are Without Merit.**

54. PJM also argues that the Debtors' filings raise "unresolved questions concerning authorization and venue." (Motion ¶17.) The so-called unresolved question regarding authorization has nothing to do with whether the appropriate governing bodies of each Debtor authorized the filings—they did. Instead, PJM's complaint is that the authorization referenced the Middle District of North Carolina. This was an error and the corrected authorizations have been on the docket since August 3, 2026, *before* PJM filed its Motion. [Dkt. 55.] As to venue, any party in interest may challenge venue; a trustee is not needed to do so.

55. PJM also points out that the Debtors made payments to MEG Staffing, LLC and MIH. (Motion ¶¶ 16, 26.) But it is not uncommon for debtors to have employees employed under a separate staffing company. Ms. Dalpe testified at the interim DIP hearing that MEG Staffing LLC employs the individuals who work for the Debtors. And even if there was a dispute between

[8] PJM's other citation, *In re Drew Transportation Services, Inc.*, 2016 WL 3751669 (Bankr. E.D.N.C. 2016) (which PJM miscites as 2016 WL 6892459), is equally inapposite. (Motion ¶ 26.) In *Drew Transportation* the Debtor's principal paid himself with estate funds without court authorization and took funds from the debtor's accounts immediately before the chapter 11 filing without reflecting these transactions on its Schedules and Statement of Financial Affairs. 2016 WL 3751669, at *3-6. Nothing like that has happened here.

MEG Staffing LLC or MIH and the Debtors, "interdebtor disputes do not standing by themselves evidence (much less establish) fraud or mismanagement, or misconduct of the type that constitutes cause under section 1104(a)(1)." *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 657 (Bankr. S.D.N.Y. 2006). Simply put at this early state of these chapter 11 cases there is no basis to conclude that the Debtors will not bring litigation as appropriate against any third party, including any insider, where the facts warrant a suit.

**III. The Appointment of a Trustee Is Not Warranted under Section 1104(a)(2).**

56. Alternatively, PJM argues that a trustee should be appointed under section 1104(a)(2). When deciding whether the appointment of a trustee is in "the best interests of creditors, any equity security holds, and other interests of the estate," courts consider the totality of circumstances, including (i) the costs of a trustee as weighed against the potential benefits to the estate; (ii) the trustworthiness of the debtor, (iii) the past and present performance of the debtor's business and the prospects for rehabilitation, and (iv) "the confidence—or lack thereof—of the business community and of creditors in present management." *Adelphia Commc'ns*, 336 B.R. at 658.

**1. The Cost-Benefit Analysis Weighs Against a Trustee.**

57. The cost-benefit analysis under section 1104(a)(2) weighs decisively against appointment of a trustee in these cases. PJM's argument about why the benefits of a trustee outweigh the costs boils down to this: it wants a different plaintiff in the lawsuit against it. Instead of facing the Debtors who know the facts and are best positioned to prosecute the estate's substantial claims against PJM, PJM wants someone else to be on the other side of the v. (Motion ¶ 33.) Accepting this argument would improperly elevate the interests of a defendant in litigation, with arguably no standing here to seek a trustee, above the interests of every creditor and equity security holder in maximizing estate assets. *See Richardson Foods,* 659 B.R. at 165 (holding that

a defendant lacked standing to move for dismissal of the case because considering their interests would elevate the interests of a defendant above those of the debtor and creditors). Indeed, the fact that no other creditor has joined PJM's Motion underscores the point—PJM's Motion is nothing more than a self-serving attempt to derail litigation and minimize its own liability.

58. PJM's Motion, if granted, also would impose substantial additional professional costs on these estates with limited resources. A new fiduciary would need to retain new counsel, engage financial advisors, and spend months familiarizing himself with the Debtors' complex regulatory history, the FERC proceedings, the adversary proceeding against PJM, and addressing FERC's claim (if it files one). *See Adelphia Commc'ns*, 336 B.R. at 646 (listing similar factors that weighed against appointing a trustee).

59. This would be especially difficult here because the Debtors' litigation is highly specialized. The FERC constitutional challenge in the Middle District of North Carolina raised novel questions at the intersection of administrative law, constitutional law, and energy regulation. The certiorari petition to the Supreme Court, which will require the filing of a reply, requires intimate familiarity with the procedural history and law surrounding PJM's decision to cancel EER auctions, and FERC's affirmance of same. Likewise, the assistance of Debtors' management is necessary to prosecute the PJM adversary proceeding and defend against FERC's alleged claim. To the extent that a new fiduciary would be solely responsible for litigating these matters, that individual would not have sufficient prior knowledge and could not effectively manage this litigation portfolio within the compressed timeframes involved. Appointing a trustee at request of defendant PJM will do nothing more than derail the claims against PJM benefitting only PJM and harming the other creditors and other interested parties in these cases.

#### 2. PJM's Other Arguments for Why a Trustee is in the Best Interests of Creditors and Equity Security Holders Mirror its Arguments for Why Cause Exists to Appoint a Trustee and Should Be Rejected for the Same Reasons That They do not Establish Cause to Appoint a Trustee.

60. PJM also repeats the arguments that it made under section 1104(a)(1): that FERC's order is binding (Motion ¶ 30), that the Debtors are liquidating (*id*. ¶ 31), and the DIP proposal originally sought to grant MIH a lien on the proceeds of avoidance actions (*id*. ¶ 32.) The FERC administrative order proves nothing; it is "as if [FERC] never found any facts at all." *AT&T*, 146 S. Ct. at 1429. As explained above, the fact that the Debtors are liquidating and managing litigation is not grounds to appoint a trustee. And the Debtors, after difficult negotiations with EIG, obtained a modification to the DIP loan that eliminates any lien on avoidance action proceeds.

61. In short, PJM is not an unbiased creditor merely seeking to protect the estate. PJM holds over $135 million of the Debtors' cash and is the defendant in an adversary proceeding where the Debtors are seeking to recover those funds. PJM's self-serving pronouncements about what is in the interests of creditors as a whole should be ignored as its interests are at odds with those of other creditors.

## IV. An Examiner Is Unnecessary and Would Be Duplicative

62. Section 1104(c) provides for the appointment of an examiner if no trustee has been appointed and a plan has not been confirmed. While the standard for appointing an examiner is less onerous than that for appointing a trustee, the appointment should be denied if the request is filed for an improper purpose such as a litigation tactic to delay (or immediately crater) a case. *See In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D.N.Y. 2012). As with a trustee, the court should weigh whether the benefits of an independent examination justify the costs to the estate. *Id*.

63. PJM seeks, in the alternative, the appointment of an examiner under 11 U.S.C. § 1104(c) to investigate the (i) the allegations of the FERC administrative order; (ii) the DIP loan

proposal; (iii) claims against insiders; and (iv) the Debtor's restructuring prospects. (Motion ¶ 38.) No investigation is needed on any of these topics. If FERC prosecutes its claims by filing a proof of claim (and it has not done so to date), litigation with FERC overseen by a court will determine the facts around those claims. Likewise this Court will assess the appropriateness of a final DIP lending order and the Bankruptcy Administrator who is actually neutral, unlike PJM, has already assessed its fairness and withdrawn her objections to it.

64. As to the Debtors' restructuring prospects, which as explained above, may include liquidation and litigation, the case will be barely two months old at the time of the hearing on PJM's Motion. PJM is not a creditor here. *See* 11 U.S.C. § 502(d). The Debtors should be given the chance to reach agreements with their actual creditors before being saddled with the cost of an examiner to determine whether they can do so. And finally, as to any alleged insider claims, PJM has not identified any alleged claims. Instead, it points only to the fact that the Debtors use a management company to employ and pay employees. Moreover, given that PJM is not a creditor here (*see* 11 U.S.C. § 502(d)) and no creditors are seeking examination on these issues, its request should be denied.

65. In short, an examiner would also impose additional costs and delays on resource-constrained estates without adding value beyond what existing litigation and court oversight already provide. *In re Spansion, Inc.*, 426 B.R. 114, 127-28 (Bankr. D. Del. 2010) (declining to appoint examiner where issues were being addressed through other mechanisms). The Court should deny this request as well.

**CONCLUSION**

66. For the foregoing reasons, the Debtors respectfully request that the Court deny PJM's Motion in its entirety—both the request for appointment of a chapter 11 trustee and the

alternative request for appointment of an examiner—and grant such other relief as may be just.

Respectfully submitted this 15th day of September, 2026.

**WALDREP WALL BABCOCK & BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (N.C. Bar No. 11135)
Jennifer B. Lyday (N.C. Bar No. 39871)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1283
Email: notice@waldrepwall.com

-and-

**JENNER & BLOCK LLP**
Catherine L. Steege (admitted *pro hac vice*)
Melissa M. Root (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
Email: csteege@jenner.com
mroot@jenner.com

*Counsel for the Debtors*

**CERTIFICATE OF SERVICE**

I, Thomas W. Waldrep, Jr., certify that I caused a copy of the foregoing to be served on September 15, 2026 via electronic service through CM/ECF upon those who registered for such service, and served via First Class United States Mail, postage prepaid, to the following parties:

Kathleen E. Perkins
Hunton Andrews Kurth LLP
101 South Tryon Street
Suite 3500
Charlotte, NC 28280

Tyler P. Brown
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Jennifer E. Wuebker
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Olivia C. Maier
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

This 15th day of September, 2026.

**WALDREP WALL BABCOCK & BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (N.C. Bar No. 11135)
Jennifer B. Lyday (N.C. Bar No. 39871)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1283
Email: notice@waldrepwall.com