**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| IN RE: | Case No. 26-30968 |
| AMERICAN EFFICIENT LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR SANCTIONS AGAINST PJM INTERCONNECTION, L.L.C. AND PJM SETTLEMENT, INC. FOR WILLFUL VIOLATION OF THE AUTOMATIC STAY**

American Efficient LLC, American Efficient Origination LLC, Affirmed Energy LLC ("**Affirmed**"), and Midcontinent Energy LLC (collectively, the "**Debtors**"), respectfully submit their Reply in support of their *Motion for Sanctions against PJM Interconnection, L.L.C. and PJM Settlement Inc. for Willful Violation of the Automatic Stay* [Dkt. 75] (the "**Motion**"), and state:[2]

**INTRODUCTION**

1. Despite the efforts of PJM Interconnection L.L.C. and PJM Settlement Inc. (collectively, "**PJM**") to confuse the issues, the Debtors' Motion raises an obvious, straightforward, and willful violation of the automatic stay. After the Debtors filed for bankruptcy, PJM demanded that the Debtors allow PJM to retain, as additional collateral, interest earned post-petition on the Debtors' funds—interest that PJM's Tariff required PJM to turnover to the Debtor, and interest that first accrued *after* the Debtors' Petition Date. PJM asked for this additional collateral to secure claims that, if such debts exist at all, indisputably arose before the Debtors' bankruptcy filing. Put in stark terms, if, following a bankruptcy filing, a creditor demanded that a

[1] The Debtors in these cases, along with each Debtor's case number, are: (i) American Efficient LLC, Case No. 26-30968; (ii) Affirmed Energy LLC, Case No. 26-30969; (iii) American Efficient Origination LLC, Case No. 26-30970; and (iv) Midcontinent Energy LLC, Case No. 26-30971.

[2] Capitalized terms used herein and not defined shall have the meaning given to them in the Motion.

debtor provide security for the creditor's claim and then seized that debtor's equipment to make sure its demands were met, the Court would have no trouble finding that the demand and subsequent seizure violated sections 362(a)(3)-(6) of the Bankruptcy Code. The same is true here. PJM demanded collateral to secure a prepetition debt and then seized that collateral placing it outside of the Debtors' control in violation of the automatic stay. PJM should be sanctioned.

2. Tacitly recognizing that it has no defense here, PJM raises a series of red-herring arguments. ***First***, it contends that because the Adversary Proceeding contains a section 549 count, the Debtors supposedly cannot also seek relief for PJM's stay violation. [Dkt. 102 ("**Response**") ¶ 1.] Not so. Nothing in the Bankruptcy Code, the Bankruptcy Rules, or the case law imposes such a limitation and PJM cites nothing to support this argument. The Motion is brought both to recover sanctions for the willful violations of the stay that occurred before and following the filing of the Adversary Proceeding, and to stop PJM from its aggressive refusal to comply with the Bankruptcy Code. The Debtors are duty bound to preserve and maximize the Affirmed estate, and their actions to protect against a creditor from taking post-petition funds to satisfy prepetition obligations are not only warranted, but necessary under these circumstances.

3. ***Second*****,** PJM cites *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995) and *City of Chicago v. Fulton*, 592 U.S. 154 (2021), to argue that not every refusal to return property to a debtor is a stay violation. (Response ¶ 4.) But PJM skips over a critical distinguishing fact: in both of those cases, the creditor did not seize additional collateral post-petition; instead, the creditor already had taken possession of the property prepetition. *Strumpf*, 516 U.S. at 17; *Fulton*, 592 U.S. at 158. Here, of course, the Motion involves property that came into existence post-petition and that PJM seized post-petition to further secure its (or FERC's) alleged prepetition claim. That is not, as PJM argues, "maintenance of the status quo"; PJM is changing the status quo

by improperly improving its alleged collateral position in violation of the automatic stay.

4. ***Finally***, PJM misleads the Court when it suggests that the Debtors are attempting to relitigate what FERC previously decided. For starters, the Adversary Proceeding raises distinct causes of action unique to a debtor-in-possession, but more fundamentally, the relief the Motion seeks is with respect to money that was not at issue in those prior FERC decisions and that PJM took *after* telling Affirmed in writing that "no additional Collateral is required to be posted at this time." (PJM April 17, 2026 Letter, attached hereto as **Exhibit A**). And PJM's reliance on the prior FERC decisions is also misplaced—as the FERC Commissioners stated in the *Order on Rehearing*: "The Complaint Order does not 'authoriz[e]' anyone to do anything, but instead merely finds reasonable PJM's *past* decision to withhold Affirmed's collateral … If PJM has taken new actions with respect to Affirmed's collateral since the Penalty Order issued, or if PJM does so in the future, Affirmed may bring those actions to the Commission's attention and seek whatever relief it believes appropriate. Neither the Complaint Order nor this order prejudges the propriety of any such action." *Affirmed Energy LLC v. PJM Interconnection, L.L.C.*, No. EL24-124-001, 2026 WL 1718516, at ¶14 (F.E.R.C. June 12, 2026) ("**Order on Rehearing**") (emphasis in original), attached hereto as **Exhibit B**. But even if the post-petition interest at issue in the Motion was somehow the subject of this prepetition dispute, that still would not give PJM a right to engage in self-help and simply take Affirmed's money without seeking relief from this Court.

5. PJM knew exactly what it was doing when it took money from the Affirmed estate and, in the Response, doubles down on its insistence that it can continue to do so. The Court should sanction PJM for its aggressive stay violations so that this misconduct stops.

## ARGUMENT

**A. The Pending Adversary Proceeding Does Not Preclude the Debtors from Taking Actions to Protect Estate Property.**

6. PJM's first argument—that a debtor cannot seek sanctions for a stay violation that is also subject to a pending adversary proceeding—is not supported by any citation or caselaw, runs counter to a debtor's duty to preserve and maximize the value of the estate, and mistakes the relief the Debtors seek here for the relief they seek in the Adversary Proceeding.

7. A motion for sanctions is the proper tool for a debtor to use to stop willful post-petition violations of the automatic stay. Unlike claims to avoid or recover transfers or to compel turnover, a request for damages and sanctions for a willful violation of the automatic stay is properly brought by motion under Rule 9014, not by adversary complaint. *See* Fed. R. Bankr. P. 7001 (enumerating the categories of disputes that must be brought as adversary proceedings; stay-violation sanctions are not among them). PJM cites no rule, statute, or decision holding that a debtor must choose between an adversary proceeding addressing distinct prepetition and post-petition transfers, on the one hand, and a sanctions motion addressing a creditor's continued violations of the stay, on the other hand.

8. The reason that a sanctions motion for a stay violation and an adversary proceeding to avoid and recover post-petition transfers are not mutually exclusive is obvious. As this Circuit has instructed, the stay "is one of the fundamental debtor protections provided by the bankruptcy laws," giving the debtor "a breathing spell from his creditors" and stopping "all collection efforts" and "all harassment." *Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir. 1986) (quoting H.R. Rep. No. 95-595, at 340–42 (1977)). When a third-party, like PJM, willfully violates the stay, it is incumbent on a debtor-in-possession, like Affirmed, to take the appropriate action to maximize and preserve the value of its estate. Here, Affirmed filed its Complaint, and

then promptly sent a demand letter to PJM demanding that it cease the post-petition stay violations. When PJM refused to do so, and in fact signaled that it would *continue* in its willful violations (which it later did in August and September 2026), Affirmed filed the Motion to protect the bankruptcy estate.

9. Last, PJM mistakes the relief the Debtors seek in the Motion for the relief they seek in the Adversary Proceeding. Affirmed's Complaint seeks to avoid and recover, and the turnover of, *inter alia*, transfers of interest that first accrued post-petition. Affirmed asserted those claims in an adversary proceeding because they seek to avoid and recover transfers and to compel turnover of specific property. *See* Fed. R. Bankr. P. 7001(a). The Motion addresses a related but separate issue, PJM's willful post-petition demand and taking of estate property in violation of the automatic stay. Nevertheless, to avoid any concern about duplicative recovery, the Debtors do not object to an order providing that any actual damages awarded on this Motion to compensate for the loss of the use of the funds PJM wrongfully took (as opposed to an award of attorneys' fees or other costs and damages) shall be credited against, and not duplicated by, any recovery of the same funds the Debtors ultimately obtain in the Adversary Proceeding.

**B. PJM's Post-petition Seizure of Newly Accrued Interest to Increase its Collateral Demand is an Affirmative Act that Violates the Automatic Stay.**

10. PJM's reliance on *Strumpf* and *Fulton* is based on PJM's erroneous statement that the Motion "does not identify any postpetition seizure, repossession, or other affirmative act by PJM to obtain possession of property." (Response, ¶ 34.). Here, the facts show that PJM affirmatively and willfully sought to change the "status quo" by taking interest from the Affirmed estate that did not exist until after Affirmed's Petition Date and that PJM had no valid basis to seize.

11. *Strumpf* and *Fulton* both distinguish between a creditor's passive maintenance of a status quo that existed as of the petition date, which section 362(a)(3) does not reach, and an affirmative post-petition act to obtain new property or exercise new control over estate property (*i.e.*, taking property that did not exist until after the petition date), which section 362(a)(3) does reach. *Strumpf*, 516 U.S. 16; *Fulton*, 592 U.S. 154. In *Strumpf*, the bank imposed a temporary administrative hold on funds already on deposit in the debtor's account at the time of the bankruptcy filing. 516 U.S. at 19–21. The Supreme Court held that the bank did not violate the automatic stay by placing a temporary hold on the funds; instead, it preserved the status quo so the court could decide whether the bank had the right to set off the funds. *Id.* at 21. Similarly, in *Fulton*, the City of Chicago had lawfully impounded the debtors' vehicles before the petition date and simply continued to hold the cars post-petition. The Supreme Court held that mere retention of property already in a creditor's possession is not an "act" within the meaning of section 362(a)(3). 592 U.S. at 158–62.

12. Here, PJM's actions cannot be characterized as "passive" or maintaining the "status quo." Examining what PJM did prepetition demonstrates that this is so. Prepetition, PJM demanded more "Collateral" from Affirmed, and then within the ninety days before these chapter 11 cases were filed, seized monies due to Affirmed to satisfy its increased demand. In its April 17, 2026, letter in which PJM advised Affirmed of PJM's intent to take Affirmed's money, PJM stated: "PJM is revising Affirmed's Collateral requirement *such that the requirement is satisfied by the application of the approximately $9.2 M described above together with all Collateral currently held by PJM, and no additional Collateral is required to be posted at this time*." (Ex. A (emphasis supplied).) PJM then did what it said it was going to do, and it took Affirmed's capacity payments totaling approximately $9.2 million to "satisfy" it new "Collateral" requirement. Had PJM stopped

there, and done nothing more post-petition, that would be maintaining the "status quo." But PJM did not stop. Post-petition, PJM decided that it wanted *more* "Collateral." Instead of honoring the Debtors' demands that PJM pay it the interest earned on its funds—as required by PJM's own Tariff—PJM seized the post-petition interest that the Debtors' funds had earned, placing those funds outside of the Debtors' control and making them unavailable to the bankruptcy estates.

13. The fact that PJM took post-petition property that is due to Affirmed is evident from PJM's own statements. As shown below, screenshots of PJM's eCredit statements dated August 3, 2026, and September 14, 2026 (true and correct copies of which are attached here as **Exhibits C** and **D**), show "Collateral Returnable" to Affirmed in the amount of the post-petition accrued interest:

| Credit Source | | Unallocated Credit | |
|---|---|---|---|
| Provided Cash Collateral | $135,987,815.07 | Collateral | $420,260.07 |
| Available Cash Collateral | $420,260.07 | Unsecured Credit Allowance | $0.00 |
| Provided LC Collateral | $0.00 | RPM Seller Credit | $0.00 |
| Available LC Collateral | $0.00 | | |
| Provided Surety Bonds | $0.00 | | |
| Available Surety Bonds | $0.00 | | |
| Minimum Collateral Reserve | $135,567,555.00 | | |
| CFTC LC Collateral | $0.00 | Unallocated Collateral Available: FTR | $420,260.07 |
| CFTC SB Collateral | $0.00 | Unallocated Collateral Available: RPM | $420,260.07 |
| Unsecured Credit Allowance | $0.00 | | |
| RPM Seller Credit | $0.00 | | |
| Tangible Net Worth - MCR | | | |
| Tangible Assets - MCR | | | |
| CFTC Net Worth | $500,100.00 | | |
| CFTC Total Assets | $147,754,645.00 | Collateral Returnable | $420,260.07 |
| | | Cash | $420,260.07 |
| FTR additional collateral required | $0.00 | LC | $0.00 |
| RPM additional collateral required | $0.00 | SB | $0.00 |

| Credit Source | | Unallocated Credit | |
|---|---|---|---|
| Provided Cash Collateral | $136,409,377.30 | Collateral | $841,822.30 |
| Available Cash Collateral | $841,822.30 | Unsecured Credit Allowance | $0.00 |
| Provided LC Collateral | $0.00 | RPM Seller Credit | $0.00 |
| Available LC Collateral | $0.00 | | |
| Provided Surety Bonds | $0.00 | | |
| Available Surety Bonds | $0.00 | | |
| Minimum Collateral Reserve | $135,567,555.00 | | |
| CFTC LC Collateral | $0.00 | Unallocated Collateral Available: FTR | $841,822.30 |
| CFTC SB Collateral | $0.00 | Unallocated Collateral Available: RPM | $841,822.30 |
| Unsecured Credit Allowance | $0.00 | | |
| RPM Seller Credit | $0.00 | | |
| Tangible Net Worth - MCR | | | |
| Tangible Assets - MCR | | | |
| CFTC Net Worth | $500,100.00 | | |
| CFTC Total Assets | $147,754,645.00 | Collateral Returnable | $841,822.30 |
| | | Cash | $841,822.30 |
| FTR additional collateral required | $0.00 | LC | $0.00 |
| RPM additional collateral required | $0.00 | SB | $0.00 |

*See* Exhibits C, D.

14. Notwithstanding the fact that according to PJM's own records the interest at issue did not exist prior to the Petition Date and is "Collateral Returnable" to Affirmed, PJM has retained and restricted Affirmed's access to the post-petition interest. This is not passive retention of a prepetition status quo like the circumstances at issue in *Strumpf* and *Fulton*; rather it is the same kind of affirmative, expansionary act—increasing a creditor's collateral position after the petition date—that courts routinely find violates the stay. *See In re Lyle*, 662 B.R. 229, 234-35 (Bankr. E.D.N.C. 2024); *In re Johnson*, 2016 WL 659020, at *3 (Bankr. W.D.N.C. Feb. 17, 2016).

15. Further, PJM's attempt to justify its seizure of the Debtors' cash on the basis that this seizure constitutes "adequate protection" for PJM's alleged claims is belied by the statements in its April 17 letter and the eCredit statements that its "Collateral" requirement was satisfied and that the post-petition interest is "Collateral Returnable" to Affirmed. PJM's "adequate protection" also fails for the obvious reason that this Court did not authorize PJM to take the Debtors' funds as "adequate protection."

16. This Court should therefore find that because PJM acted (i) "to obtain possession of … property from the estate or to exercise control over property of the estate" in violation of section 362(a)(3), (ii) "to create, perfect, or enforce any lien against property of the estate" in violation of section 362(a)(4); and (iii) "to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title" in violation of section 362(a)(6), that PJM is subject to sanctions.

**C. PJM's Assertion that Affirmed's Right to the Post-petition Interest is Disputed Does Not License Self-Help.**

17. PJM also seeks to justify its stay violation by arguing that Affirmed's right to its post-petition interest is disputed. As with PJM's other contentions, this argument fails on both legal and factual bases.

18. To begin, it is misleading for PJM to state that the Motion seeks to "re-litigate" the issue of whether PJM wrongfully took Affirmed's post-petition interest. Affirmed never litigated that issue before FERC, and as set forth in the Order on Rehearing that PJM cites to but conveniently does not attach, FERC itself was deliberate and express that its decision did not apply to future takings by PJM:

> The Complaint Order does not 'authoriz[e]' anyone to do anything, but instead merely finds reasonable PJM's *past* decision to withhold Affirmed's collateral … If PJM has taken new actions with respect to Affirmed's collateral since the Penalty Order issued, or if PJM does so in the future, Affirmed may bring those actions to the Commission's attention and seek whatever relief it believes appropriate. Neither the Complaint Order nor this order prejudges the propriety of any such action.

Exhibit B, Order on Rehearing, ¶14 (emphasis in original). Thus, the Order on Rehearing in no way addressed or condoned PJM's post-petition stay violation.

19. But even if FERC had not been crystal clear that the Complaint Order did not authorize PJM to withhold Affirmed's property in the future, the Complaint Order still would not preclude this Motion under settled Fourth Circuit precedent. *Energy Dev. Corp. v. Cabot Oil & Gas Corp.*, No. 2:04-0862, 2005 WL 8159335, at *2 (S.D. W. Va. Mar. 15, 2005) is instructive on this point. In that decision, the court held that a '"critical predicate"' for applying claim preclusion in the Fourth Circuit is that the prior court could have adjudicated all theories of recovery. *Id.* at *2 (citing *Dionne v. Mayor and City Council of Baltimore*, 40 F.3d 677, 684 (4th Cir. 1994)). In that case, a FERC order dismissing the plaintiff's complaint was not entitled to preclusive effect in a separate federal court case because the federal case asserted common law claims that could not have been brought before FERC. The same is true here. The Debtors could not have brought their Bankruptcy Code-based claims, including this stay violation Motion, before FERC and thus

any prior orders FERC entered cannot preclude these claims.[3]

20. Moreover, although PJM's Tariff is clear that "[i]nterest on a cash deposit shall accrue to the benefit of the Participant," (Tariff, Attachment Q at §§ V, V.F), even if there were a dispute about PJM's legal entitlement to Affirmed's post-petition interest, PJM could not unilaterally resolve that dispute by taking Affirmed's money. A creditor who believes the automatic stay should not prevent it from obtaining or retaining estate property must seek relief from the stay under section 362(d); it may not act unilaterally and litigate the legality of its conduct only after the debtor is forced to seek sanctions. This is in effect the holding in *Strumpf*, where the Court approved of the bank's temporary hold on the debtor's account subject to the bank promptly seeking stay relief from the bankruptcy court. *Strumpf*, 516 U.S. at 19 (holding the bank's actions were not a setoff because "[p]etitioner refused to pay its debt, not permanently and absolutely, but only while it sought relief under § 362(d) from the automatic stay.").

21. Other courts have made the same point. In *In re Lansdale Family Restaurants, Inc.*, 977 F.2d 826, 828 (3d Cir. 1992), the Third Circuit upheld a stay violation when the creditor changed terms post-petition to impose a fee that it then applied against a prepetition debt, holding

---

[3] To the extent that PJM is withholding the interest because of FERC's administrative order alleging that certain of the Debtors should be sanctioned, that decision would also be contrary to the law and to FERC's own directives. As set forth in detail in the *Debtor's Objection To Motion Of PJM Interconnection, L.L.C. And PJM Settlement, Inc. For Entry Of An Order Appointing A Chapter 11 Trustee, Or In The Alternative, An Examiner* [Dkt. 101], FERC's administrative order is not enforceable. In the Order on Rehearing, FERC stated:

> *We now clarify that Affirmed's 'financial obligation' to pay disgorgement and civil penalties will not be 'created' until the Commission, in an action to enforce the Penalty Order, secures a judgment from a federal district court.* American Efficient has no obligation to pay disgorgement or civil penalties prior to that time, and thus it would not '[f]ail[] to comply' with the Penalty Order merely by withholding such payments until judgment is rendered.

<u>Exhibit B</u>, Order on Rehearing, ¶16 (emphasis added). If the Debtors have no obligation to pay under the administrative order, PJM has no basis to collect, as it is attempting to do by seizing the Debtors' property.

"[t]he characterization by [the creditor] at oral argument of the decrease in the total amount owed as an 'accounting procedure' does not respond to the reality that the 'credits' were applied by [the creditor] to reduce the pre-bankruptcy debt." 977 F.2d at 828. Similarly, *In re WVF Acquisition*, LLC, 420 B.R. 902, 906-08, 910 (Bankr. S.D. Fla. 2009), when an internet provider stopped service post-petition based on a prepetition dispute, the court found a willful stay violation.

22. The escrow decisions PJM cites—*Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661 (Bankr. S.D.N.Y. 1985); *Matter of Newcomb*, 744 F.2d 621 (8th Cir. 1984); and *In re Royal Business School, Inc.*, 157 B.R. 932 (Bankr. E.D.N.Y. 1993)—do not support PJM's argument that the presence of a dispute excuses a stay violation. Those cases address whether a debtor can compel turnover of funds already held in escrow before the petition date. Neither addresses, let alone excuses, a creditor's post-petition act of unilaterally enlarging its own collateral position after the debtor has filed for bankruptcy by taking new post-petition estate property. Even if Affirmed's turnover count in the Adversary Proceeding ultimately fails, that would not retroactively authorize PJM to have acted without this Court's permission in the meantime.

**D. The Court Should Award Actual Damages, Attorneys' Fees, and Punitive Damages for PJM's Willful Violation of the Stay.**

23. The Court should award Affirmed actual damages, attorneys' fees, and punitive damages for PJM's willful and continued violation of the stay. Willfulness under section 362(k) requires only that the creditor "commit an intentional act with knowledge of the automatic stay"—not any specific intent to violate the automatic stay. *Lyle*, 662 B.R. at 234-35; *accord Johnson*, 2016 WL 659020, at *3 (violation is willful where creditor has notice of the bankruptcy and "takes an action that is prohibited by the stay despite the notice") (citing *Budget Serv. Co.*, 804 F.2d at 292). A creditor that proceeds in the face of such notice does so "at its own risk." *Johnson*, 2016 WL 659020, at *3.

24. PJM asks the Court to import the "fair ground of doubt" standard from *Taggart v. Lorenzen*, 587 U.S. 554, 560–61 (2019), into this section 362(k) motion. (Response ¶ 47.) *Taggart* addressed civil contempt for violating a discharge injunction under section 524—a different statute serving a different purpose, entered after a case-specific judicial determination of discharge. Section 362(k)'s well-established standard requires only that the creditor commit an intentional act with knowledge of the pendency of the bankruptcy case, not a specific intent to violate the stay, and not the absence of a colorable legal position. *See Budget Serv. Co.*, 804 F.2d at 292-93; *Johnson*, 2016 WL 659020, at *3; *Lyle*, 662 B.R. at 234-35. PJM identifies no Fourth Circuit or Western District of North Carolina authority displacing that settled standard with *Taggart*'s, and the Debtors are aware of none.

25. Once willfulness is established, an award of actual damages and attorneys' fees is the norm, not the exception. *Budget Serv. Co.*, 804 F.2d at 292–93; *Johnson*, 2016 WL 659020, at 4; *Lyle*, 662 B.R. at 237-38. Affirmed's estate has been deprived of the use of no less than $1.2 million in estate funds as a direct result of PJM's post-petition conduct, together with the fees and costs Affirmed incurred investigating that conduct, sending the August 4, 2026 demand letter, bringing this Motion, and amending the Complaint.[4] A daily fine until PJM turns over the withheld interest, together with an award of actual damages and reasonable attorneys' fees under section 362(k)(1), is warranted and, as discussed above, can be structured to avoid any double recovery with the Adversary Proceeding.

26. Punitive damages are also appropriate given PJM's demonstrated pattern of "utter disregard" for the stay. *Lyle*, 662 B.R. at 238. PJM is represented by sophisticated bankruptcy

[4] As of the date of the Motion, PJM had taken $403,750.95 in post-petition interest that was included in the Complaint, and $420,260.17 in post-petition interest after the Complaint. After the Debtors filed the Motion, as shown in Exhibit D, PJM took another $421,562.13.

counsel, had already been sued once in the adversary proceeding for taking Affirmed's post-petition interest, and chose to do so again rather than seek stay relief. An award sufficient to deter PJM from continuing that practice is squarely within the Court's authority under sections 362(k)(1) and 105(a).

**WHEREFORE**, for the reasons set forth herein and in the Motion, the Debtors respectfully request that the Court: (a) impose sanctions, including actual damages, attorneys' fees and costs, (b) impose a daily fine until PJM ceases its willful stay violations and turns over the monthly interest earned on the Debtors' Affirmed Account, and (c) award any other relief the Court deems just and appropriate.

Respectfully submitted, this 21st day of September, 2026

**WALDREP WALL BABCOCK &
BAILEY PLLC**

*/s/ Jennifer B. Lyday*
Thomas W. Waldrep, Jr. (N.C. Bar No. 11135)
Jennifer B. Lyday (N.C. Bar No. 39871)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1283
Email: notice@waldrepwall.com

-and-

**JENNER & BLOCK LLP**

Catherine L. Steege (admitted *pro hac vice*)
Melissa M. Root (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
Email: csteege@jenner.com
mroot@jenner.com

*Counsel for the Debtors*

# EXHIBIT A

pjm | Settlement

2750 Monroe Blvd.
Audubon, PA 19403

**April 17, 2026**

**VIA EMAIL**

Angela Fox (angela@affirmed.energy)
Luke Fishback (luke@affirmed.energy)

Re: **REVISED COLLATERAL REQUIREMENT - APRIL 16, 2026 UCR DEMAND TO MARKET PARTICIPANT**

Affirmed Energy LLC ("Affirmed"):

PJM is writing to follow up on its April 16, 2026 UCR demand letter (the "April 16th Demand") requiring the posting of additional Collateral.

As described in the April 16th Demand, as well as prior UCR communications, PJM determined that Affirmed presents an unreasonable credit risk to the PJM Markets based on, among other things, the magnitude of repayment obligations associated with capacity revenues for the 2024/25 and 2025/26 Delivery Years, as well as Affirmed's financial condition. Based on that assessment, the April 16th Demand required the posting of $60 million in additional Collateral pursuant to Attachment Q of the PJM Tariff.

In light of PJM's assessment of Affirmed's current circumstances and to address immediate risk to the PJM Markets, PJM will apply approximately $9.2M in capacity revenues otherwise payable to Affirmed for the 2025/26 Delivery Year toward Affirmed's Collateral requirement under Attachment Q.

Based on the foregoing, PJM is revising Affirmed's Collateral requirement such that the requirement is satisfied by the application of the approximately $9.2M described above together with all Collateral currently held by PJM, and no additional Collateral is required to be posted at this time. All existing Collateral previously posted shall remain in place, continue to be required, and will not be reduced or released as a result of this revision. This is subject to the following:

- PJM's determination that Affirmed presents an unreasonable credit risk remains unchanged;
- PJM reserves all rights to require additional Collateral, including amounts consistent with the exposures identified in the April 16th Demand and prior UCR communications, as circumstances warrant; and
- PJM continues to evaluate Affirmed's circumstances, including repayment obligations associated with prior capacity revenue payments.

This communication is provided pursuant to PJM's authority under Attachment Q to monitor and manage credit risk and to determine and require Collateral commensurate with the risks presented by a Market Participant.

2750 Monroe Blvd.
Audubon, PA 19403

Please contact Gwen Kelly at (610) 639-3812 or Gwen.Kelly@pjm.com, or Kris Neild at (484) 947-8680 or Kristopher.Neild@pjm.com if you have questions or require additional information. Thank you for your attention and cooperation.

Sincerely,

Gwen Kelly
Sr. Director, Credit Risk & Collateral Management

# EXHIBIT B

195 FERC ¶ 61,199
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Laura V. Swett, Chairman;
David Rosner, Lindsay S. See,
Judy W. Chang, and David LaCerte.

Affirmed Energy LLC v. PJM Interconnection, L.L.C. Docket No. EL24-124-001

ORDER ON REHEARING

(Issued June 12, 2026))

1. On April 15, 2026, the Commission issued an order denying a complaint (Complaint) filed by Affirmed Energy LLC (Affirmed) against PJM Interconnection, L.L.C. (PJM). The Complaint alleged that it is unjust and unreasonable, and a violation of PJM's tariff, for PJM to withhold collateral that Affirmed posted in connection with its participation in PJM's capacity auction for the 2023/2024 Delivery Year.[1] Affirmed timely sought rehearing. We grant the request for rehearing in part and deny it in part, as discussed below.

## I. **Background**

2. Under PJM's tariff, entities that seek to participate in PJM's capacity market are required to post Collateral or Restricted Collateral[2] if PJM determines that those entities pose an unreasonable credit risk to the PJM Markets.[3] If PJM makes a determination that

---

[1] *Affirmed Energy LLC v. PJM Interconnection, L.L.C.*, 195 FERC ¶ 61,044 (2026) (Complaint Order).

[2] PJM's tariff defines Collateral as "a cash deposit, including any interest thereon, or a Letter of Credit issued for the benefit of PJM or PJMSettlement, in an amount and form determined by and acceptable to PJM or PJMSettlement, provided by a Participant to PJM or PJMSettlement as credit support in order to participate in the PJM Markets or take Transmission Service." PJM, Intra-PJM Tariffs, C-D, OATT Definitions – C-D (40.1.1). Restricted Collateral is defined as Collateral "which cannot be used, netted, credited or spent by the Participant to satisfy any other obligations." PJM, Intra-PJM Tariffs, R-S, OATT Definitions – R - S (42.0.0).

[3] *See* Complaint Order, 195 FERC ¶ 61,044 at P 2; *see also id.* PP 3-4 (discussing PJM's ongoing risk evaluation procedure to determine whether a Material Adverse Change renders it appropriate for PJM to revise its determination of its collateral

an applicant poses such a risk, PJM may require the posting of collateral "commensurate with the Applicant's risk of financial default . . . to the extent and for the time period it determines is necessary to mitigate the unreasonable credit risk to the PJM Markets."[4] When PJM requires an applicant or market participant to post Restricted Collateral, that collateral "will not be returned . . . until PJM has determined that the risk for which such Restricted Collateral is being held has subsided or been resolved."[5]

3. In 2014, Affirmed began voluntarily participating in PJM's capacity auctions by submitting putative energy efficiency resources (EER) as capacity resources.[6] In May 2021, the Commission's Office of Enforcement and Regulatory Accounting (Enforcement) began investigating American Efficient, LLC and several of its corporate affiliates, including Affirmed (collectively, American Efficient). That investigation focused on whether American Efficient had violated the tariffs of PJM or Midcontinent Independent System Operator, Inc. (MISO) or had engaged in market manipulation, including, as relevant here, during the auctions for PJM's 2023/2024 Delivery Year.[7] PJM states that Enforcement staff's initial findings regarding Affirmed prompted it to evaluate Affirmed's risk profile; upon evaluation, PJM determined that Affirmed represents an unreasonable credit risk and required Affirmed to post Restricted Collateral.[8]

---

requirements). Unless otherwise noted, capitalized terms have the meanings ascribed to them in PJM's tariff.

[4] PJM, Intra-PJM Tariffs, OATT, attach. Q, Q.II (0.0.0), § II.D (Tariff, attach. Q.II); *see also id.* § II.E (similarly providing for an ongoing risk evaluation for market participants to assess whether they pose an unreasonable credit risk); Complaint Order, 195 FERC ¶ 61,044 at PP 3-4.

[5] Tariff, attach. Q.II, § II.F.

[6] The Commission approved PJM's proposal to sunset participation of EERs in its capacity markets after the 2025/2026 Delivery Year. *See* Complaint Order, 195 FERC ¶ 61,044 at P 6 (noting that the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) affirmed the Commission's approval of PJM's proposal). The Delivery Year runs from June 1 to May 31.

[7] *See* Complaint Order, 195 FERC ¶ 61,044 at P 7.

[8] *See id.* PP 16-17 (discussing the risk factors supporting PJM's determination).

4. Affirmed filed the Complaint on July 5, 2024, arguing that the Commission should find that it is unjust and unreasonable under Federal Power Act (FPA) section 206,[9] and a violation of PJM's tariff, for PJM to withhold collateral that Affirmed posted in 2022 for a Delivery Year that is now finished. The Complaint also alleges that PJM was not permitted to withhold that collateral after PJM approved the capacity value associated with Affirmed's EERs for that Delivery Year.[10]

5. In the Complaint Order, the Commission applied the relevant terms of PJM's tariff and denied the Complaint. The Commission explained that PJM had designated the collateral at issue as Restricted Collateral, which—under PJM's tariff—need not be returned "until PJM has determined that the risk for which such Restricted Collateral is being held has subsided or been resolved."[11] PJM reached the conclusion that the relevant risk had not "subsided or been resolved," given the many market and financial risk factors that remained present.[12] The Commission found that PJM's decision represented a "proper[] exercise[]" of "its discretion within the confines of the tariff," and that PJM therefore was "not required to return Affirmed's Restricted Collateral under this tariff provision."[13] Although Affirmed's Complaint took issue with PJM's consideration of the then-pending enforcement proceeding as a basis to conclude Affirmed was an unreasonable credit risk, the Complaint Order explained at length that PJM also considered a number of other indicators in making its determination.[14]

6. On December 16, 2024, after Affirmed filed the Complaint, the Commission issued an order directing American Efficient to show cause why it should not be found to

---

[9] 16 U.S.C. § 824e.

[10] Complaint Order, 195 FERC ¶ 61,044 at P 8 (citing Complaint at 1); *see also id.* PP 8-12 (summarizing Affirmed's arguments that Affirmed was entitled to return of the collateral under the terms of PJM's tariff).

[11] *Id.* P 31 (citing Tariff, attach. Q.II, § II.F).

[12] *Id.*

[13] *Id.*

[14] *See, e.g.*, *id.* P 33 (explaining that PJM also considered Affirmed's thin capitalization; PJM's independent audit of Affirmed's energy efficiency program; lack of access to debt that supports working capital; and Affirmed's notification to PJM that Affirmed's lender had restricted the capital available to the company); *id.* P 35; *id.* P 36 (noting the flexibility and discretion afforded to PJM in conducting its inquiry).

have violated FPA section 222[15] and the Commission's Anti-Manipulation Rule,[16] as well as certain provisions of PJM's and MISO's tariffs.[17] On April 15, 2026 (the same day that the Commission issued the Complaint Order), the Commission issued an order in those separate proceedings concluding that American Efficient violated FPA section 222 and PJM's and MISO's tariffs and assessing disgorgement of $410 million in unjust profits and a civil penalty of $722 million.[18] The Commission recognized that American Efficient had elected to have the penalty proceeding decided by the Commission, with the Penalty Order then subject to de novo review by an appropriate federal district court.[19]

## II. Request for Rehearing

7. Affirmed's rehearing request largely focuses on paragraph 34 of the Complaint Order—and in particular the portions of that paragraph that are italicized below:

> Affirmed acknowledges that the tariff allows PJM to obtain or retain collateral in some circumstances when a market participant represents an unreasonable credit risk, and we find that the circumstances here provided reasonable grounds for PJM to determine that Affirmed posed an unreasonable credit risk. Attachment Q.II, section II.D states that an "[u]nreasonable credit risk shall be determined by the likelihood that an Applicant will default on a financial obligation arising from its participation in any PJM Markets. A *Commission* or court order directing Affirmed to disgorge unlawfully obtained revenues from the PJM capacity market would create a financial obligation arising from Affirmed's participation in PJM Markets. *Failure to comply with such an order would be a default, for which PJM could draw upon the Restricted Collateral used to secure PJM against potential penalties for the 2023/2024 Delivery Year.*[20]

---

[15] 16 U.S.C. § 824v.

[16] 18 C.F.R. § 1c.2 (2025).

[17] Complaint Order, 195 FERC ¶ 61,044 at P 7.

[18] *See Am. Efficient, LLC*, 195 FERC ¶ 61,043, at PP 1-17 (2026) (Penalty Order).

[19] *Id.* PP 50, 597 (noting that the district court's final judgment may be subject to further appellate review).

[20] Complaint Order, 195 FERC ¶ 61,044 at P 34 (emphasis added); *see* Rehearing Request at 1.

8. Affirmed contends that the italicized statements above "purport to impose immediate legal consequences upon Affirmed for a failure to pay a disgorgement order—by imposing a finding of default and permitting PJM to 'draw upon' Affirmed's collateral that it currently holds."[21] Affirmed states that the Complaint Order "could be read to suggest that the Commission's determination in the Penalty Order is presently effective," but notes that it "does not believe the Commission intended as much."[22] Affirmed contends it would be "unlawful for PJM to draw upon or take any action as to Affirmed's collateral based on a Commission disgorgement order that is subject to de novo adjudication in federal court" and states that "impos[ing] an immediate monetary consequence based on an agency penalty order" that has not yet been tested on judicial review would "contradict the Commission's own position, as well as the United States' position in the Supreme Court."[23] Affirmed therefore requests that the Commission "grant rehearing to clarify" that PJM may not use American Efficient's nonpayment of disgorgement to find Affirmed in default, draw on its collateral, or otherwise impose legal consequences on Affirmed.[24]

9. Affirmed also asserts that the Commission failed to explain in the Complaint Order why PJM is entitled to withhold the full amount of Affirmed's collateral.[25] First, Affirmed argues that, at the end of May 2026, it will no longer have an "open position" with PJM due to the sunsetting of EER participation in PJM's capacity markets, and that this renders "stale" PJM's interest in controlling the risk that Affirmed "represents to PJM's markets 'for so long as Affirmed continues to participate in them.'"[26] Next, Affirmed takes the position that, "[o]nce PJM approves the participant's post-installation measurement and verification [(PIMV)] report for the relevant delivery year, PJM is obligated to return the collateral," except for collateral designated as restricted while PJM audits particular resources' performance.[27] Affirmed states "neither PJM nor the

---

[21] Rehearing Request at 1.

[22] *Id*. at 2.

[23] *Id.* at 3; *see also id.* at 7-9 (similar).

[24] *Id*. at 3, 11, 15; *see id*. at 3, 15 (requesting that the Commission modify the Complaint Order to remove the phrase "Commission or" from the language from paragraph 34 quoted above).

[25] *See id.* at 3-4, 12-15.

[26] *Id.* at 12-13 (quoting PJM Answer at 24).

[27] *Id.* at 13 (citing Tariff, attach. Q.V, § V); *see also id.* at 14 (arguing that the enforcement proceedings against Affirmed do not support withholding the collateral, again on the theory that collateral may only be withheld in connection with "PJM's

[Complaint] Order make any attempt to explain the extent of any potential capacity deficiency resource charges that may result from the ongoing audits of Affirmed—or that the full $130 million of collateral is needed to secure any possible maximum charges."[28] Affirmed claims that, as a result, the Commission "should direct PJM to release an appropriate amount of the collateral immediately."[29]

## III. <u>Discussion</u>

### A. <u>Procedural Matters</u>

10. On June 1, 2026, PJM filed a motion for leave to answer and answer in response to the rehearing request. Rule 713(d)(1) of the Commission's Rules of Practice and Procedure[30] prohibits an answer to a request for rehearing. Accordingly, we deny PJM's motion to answer the rehearing request and reject the answer.

11. On June 9, 2026, Affirmed filed a "Motion for Leave to Submit New Information in Support of Affirmed's Request for Rehearing." Section 313(a) of the FPA[31] and Rule 713(b) of the Commission's Rules of Practice and Procedure[32] require parties to file a request for rehearing not later than 30 days after issuance of any final decision or other final order in a proceeding. Both the Commission and the courts have consistently held that the 30-day requirement in section 313(a) is a jurisdictional requirement that the Commission does not have discretion to waive.[33] Further, the Commission has

---

review of Affirmed's [PIMV] reports, including its commencement of audits as to those reports," focusing on the performance of the resource as compared to its capacity commitments).

[28] *Id.* at 13-14.

[29] *Id.* at 15.

[30] 18 C.F.R. § 385.713(d)(1) (2025).

[31] 16 U.S.C. § 825*l*(a).

[32] 18 C.F.R. § 385.713(b).

[33] *See, e.g.*, *City of Campbell v. FERC*, 770 F.2d 1180, 1183 (D.C. Cir 1985) (holding that the 30-day requirement to file a request for rehearing in the FPA "is as much a part of the jurisdictional threshold as the mandate to file for a rehearing"); *PJM Interconnection, L.L.C.*, 138 FERC ¶ 61,160, at P 3 (2012); *La. Energy & Power*

interpreted this jurisdictional limitation as precluding it from considering a late-filed supplement or amendment to a timely filed request for rehearing.[34] Thus, we reject Affirmed's untimely supplement to its request for rehearing.[35]

## B. Substantive Matters

### 1. The Commission Is Not Imposing "Immediate Legal Consequences" For Failure to Pay a Disgorgement Order

12. As explained above, Affirmed brought its Complaint pursuant to FPA section 206,[36] alleging a specific wrong by PJM in the administration of its tariff provisions governing the withholding of collateral.[37] PJM's decision to continue withholding the

---

*Auth.*, 117 FERC ¶ 61,258, at 62,301 (2006); *Tex.-N.M. Power Co. v. El Paso Elec. Co.*, 107 FERC ¶ 61,316, at P 22 (2004); *Cal. Indep. Sys. Operator Corp.*, 105 FERC ¶ 61,322, at P 9 (2003).

[34] *See Old Dominion Elec. Coop.*, 154 FERC ¶ 61,155, at P 8 (2016); *CMS Midland, Inc.*, 56 FERC ¶ 61,177, at 61,623 (1991) ("Any subsequent filing supplementing or revising that request [for rehearing] is in essence a new request for rehearing and thereby precluded under section 313(a) of the [Federal Power] Act."); *Pub. Serv. Co. of N.H.*, 56 FERC ¶ 61,105, at 61,403 (1991) ("Commission precedent is clear that supplements to timely filed requests for rehearing, when filed after the expiration of the statutory thirty-day period, will be rejected."); *cf. also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554-55 (1978) (explaining that administrative consideration of evidence always creates a gap between the time the record is closed and the time the administrative decision is promulgated).

[35] *See, e.g.*, *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp.*, 133 FERC ¶ 61,014, at P 15 (2010) ("[W]e are not obligated to accept a filing solely on the basis of its party-bestowed title. Instead, we examine the substance of the pleading.").

[36] 16 U.S.C. § 824e; *see also* 18 C.F.R. § 385.206(a) (2025). ("Any person may file a complaint seeking Commission action against any other person alleged to be in contravention or violation of any statute, rule, order, or other law administered by the Commission, or for any other alleged wrong over which the Commission may have jurisdiction.").

[37] *See, e.g.*, Complaint at 1 (requesting the Commission find that "it is unjust and unreasonable under FPA Section 206, and a violation of PJM's tariff, for PJM to withhold collateral"); *id.* at 2 ("Affirmed files this Complaint to stop PJM from violating its Tariff and the [FPA] by withholding the collateral it owes to Affirmed. . . . Affirmed brings this complaint for the immediate return of . . . its collateral that PJM is illegally

collateral was based on its "determin[ation] that Affirmed represents an unreasonable credit risk, which is connected to the risk of *future* default"; that risk of future default in turn stemmed from numerous "identified financial risk factors," including but not limited to potential monetary obligations that might result from the then-pending enforcement proceeding.[38] The Commission found that PJM "followed . . . its tariff" and that "the circumstances here provided reasonable grounds for PJM to determine that Affirmed posed an unreasonable credit risk."[39] The Commission concluded that Affirmed failed to meet its burden under FPA section 206 to demonstrate that PJM violated its tariff or that PJM's tariff is unjust, unreasonable, unduly discriminatory, or preferential, and the Commission therefore denied the Complaint.[40] To be clear, the one and only holding of the Complaint Order was to deny Affirmed's allegations that PJM was wrongly withholding Affirmed's collateral under the rules in PJM's tariff.[41]

13. In its rehearing request, Affirmed reads the Complaint Order far more broadly, and insists that the Complaint Order erred by "impos[ing] immediate legal consequences upon Affirmed for a failure to pay a disgorgement order."[42] We disagree.

14. The Commission did not hold in the Complaint Order that "the Commission's determination in the Penalty Order is presently effective," as Affirmed now claims.[43] We

---

withholding."); *see also id.* at 14 (asserting that "Affirmed's request for relief is narrow tailored to the unique circumstances here" and requesting a finding that it is unjust and unreasonable, and in contravention of PJM's tariff, for PJM to withhold the collateral and an order directing PJM to return the collateral to Affirmed); *id.* at 17.

[38] Complaint Order, 195 FERC ¶ 61,044 at P 38.

[39] *Id.* PP 30, 34.

[40] *See id*. PP 31-38. This is evident even as to the particular statement that Affirmed quotes, which was part of the Commission's explanation as to why "the circumstances here provided reasonable grounds for PJM to determine that Affirmed posed an unreasonable credit risk," *id.* P 34, such that PJM was justified in retaining the collateral, *see id.* P 31.

[41] *See id.* PP 1, 29, ordering para.; *see also id.* P 38 (explaining that "PJM has determined that Affirmed represents an unreasonable credit risk, which is connected to the risk of future default stemming from the enforcement proceeding in combination with Affirmed's other identified financial risk factors").

[42] Rehearing Request at 1.

[43] *Id*. at 2.

again emphasize that the sole issue decided in the Complaint Order was whether Affirmed met its burden under FPA section 206 in alleging that PJM's decision not to return Affirmed's Restricted Collateral was unlawful. Nor is Affirmed correct to read the Complaint Order as "authorizing PJM to act immediately against Affirmed for not paying disgorgement."[44] Again, the Complaint Order contains no such holding. The Complaint Order does not "authoriz[e]" anyone to do anything, but instead merely finds reasonable PJM's *past* decision to withhold Affirmed's collateral because Affirmed poses an unreasonable credit risk based on the totality of the circumstances. If PJM has taken new actions with respect to Affirmed's collateral since the Penalty Order issued, or if PJM does so in the future, Affirmed may bring those actions to the Commission's attention and seek whatever relief it believes appropriate. Neither the Complaint Order nor this order prejudges the propriety of any such actions.

15. As noted above, paragraph 34 of the Complaint Order states that

> A Commission or court order directing Affirmed to disgorge unlawfully obtained revenues from the PJM capacity market would create a financial obligation arising from Affirmed's participation in PJM Markets. Failure to comply with such an order would be a default, for which PJM could draw upon the Restricted Collateral used to secure PJM against potential penalties for the 2023/2024 Delivery Year.[45]

Arguably, these statements introduced some ambiguity as to the issues the Commission resolved in the Complaint Order. Out of an abundance of caution, we now grant rehearing to strike the above-quoted language in paragraph 34 of the Complaint Order.

16. We now clarify that Affirmed's "financial obligation" to pay disgorgement and civil penalties will not be "created" until the Commission, in an action to enforce the Penalty Order, secures a judgment from a federal district court. American Efficient has no obligation to pay disgorgement or civil penalties prior to that time, and thus it would not "[f]ail[] to comply" with the Penalty Order[46] merely by withholding such payments until judgment is rendered. We further clarify that whether non-payment on a judicial judgment would constitute "Event of Default" under the PJM Tariff is not a question presented in Affirmed's FPA section 206 complaint or in this proceeding[47]; that question

---

[44] *Id*. at 7.

[45] Complaint Order, 195 FERC ¶ 61,044 at P 34.

[46] *Id.*

[47] To our knowledge, PJM has not found an "Event of Default" with regard to Affirmed as a result of the Penalty Order. *Cf.* Tariff, attach. Q, Q.IX (0.0.0). PJM's

is one for PJM to consider in the first instance, if and when that question is presented. We also clarify that the Commission did not intend to answer or prejudge that question in the Complaint Order, as the issue is not ripe for Commission review.

17. Our grant of partial rehearing does not change the outcome of the Complaint Order, nor do the clarifications offered above. PJM has determined that Affirmed represents an unreasonable credit risk, which is connected to the risk of future default stemming from the enforcement proceeding in combination with Affirmed's other identified financial risk factors.[48] In particular, PJM determined that Affirmed posed an unreasonable credit risk based on six individual factors: (1) the significant size of Affirmed's capacity market position for the 2023/2024 Delivery Year; (2) the pendency of the enforcement proceeding; (3) Affirmed's thin capitalization; (4) Affirmed's notification to PJM that its lender was restricting Affirmed's liquidity; (5) the audit of Affirmed's Energy Efficiency Program; and (6) Affirmed's balance sheet and capitalization in relation to its PJM market activity.[49] We sustain the Complaint Order's

---

prior decision to hold Affirmed's collateral could not have been based on a "Event of Default" stemming from non-payment of disgorgement and penalties pursuant to a Penalty Order that had not yet issued. PJM's decision was instead based on a finding, first made some *two years* before the Penalty Order issued, that Affirmed represented an "unreasonable credit risk."

We also note that the Complaint Order did not pass judgment on the question of whether issuance of the Penalty Order is an appropriate warrant for PJM to draw on or otherwise dispose of Affirmed's collateral. We do not think it plausible to read the Complaint Order (which only concerns whether PJM properly exercised its discretion to *withhold* Affirmed's collateral) as a warrant from the Commission for PJM to *dispose* of Affirmed's collateral (an issue that was not presented in Affirmed's Complaint).

[48] Complaint Order, 195 FERC ¶ 61,044 at P 38; *see also id.* PP 33, 35 (discussing the factors PJM considered). We clarify in particular that, when considering whether Affirmed represented an "[u]nreasonable credit risk" due to the "likelihood that [Affirmed] will default on a financial obligation," PJM can and reasonably did consider Affirmed's potential *future* "default" on a *future* district court order that sustains the Penalty Order. *See* Tariff, attach. Q.II, § II.F ("Unreasonable credit risk shall be determined by the likelihood that an Applicant will default on a financial obligation arising from its participation in any PJM Markets."). We further clarify that a future "failure to comply" with a district court's order would be a "default on a financial obligation," and that PJM was therefore entitled to consider the possibility of such a default when evaluating whether Affirmed presented a credit risk.

[49] *See* Complaint Order, 195 FERC ¶ 61,044 at P 35.

conclusion that Affirmed has not carried its burden under FPA section 206 to show that PJM's withholding of Affirmed's collateral is unjust and unreasonable or contrary to PJM's tariff,[50] and we deny rehearing to the extent Affirmed's rehearing request sought to disrupt that holding of the Complaint Order.

18. As a final matter, we note that Affirmed's rehearing request appears to rest on an improper conflation of (a) direct financial consequences that flow from the Penalty Order itself with (b) collateral, downstream effects of the penalty proceeding that are attributable not to the Commission's actions but rather to the voluntary choices of Affirmed and third parties. The latter category of consequences do not implicate *Jarkesy*[51] and the Seventh Amendment.

19. Affirmed voluntarily chose to participate in PJM's capacity markets and voluntarily agreed to be bound by PJM's rules pertaining to those markets. Thus, even if PJM were to find Affirmed in "default" as a result of the Penalty Order—which to our knowledge it has not done—the consequences of that finding would not implicate *Jarkesy*. Penalty orders issued by the Commission may have all manner of indirect, practical consequences for parties to those orders. To suggest that these collateral consequences are somehow laden with constitutional significance, or that their very existence renders the agency proceedings that led to the penalty order unconstitutional, strains credulity. That the enforcement proceedings before the Commission informed PJM's application of its own tariff does not, under *Jarkesy*, render the application of those rules a legal consequence of the penalty proceeding before the Commission, let alone give rise to the right of a jury trial.

### 2. **<u>Affirmed's Remaining Argument Is Procedurally Barred and, Regardless, Fails to Show Error</u>**

20. Affirmed's remaining argument—that PJM and the Commission failed to explain why PJM's continued withholding of the full amount of Affirmed's collateral, as opposed to some lesser amount that would be sufficient to guard against the ongoing risks Affirmed poses—is not convincing.

21. At the outset, this argument was not raised prior to rehearing. Affirmed's claim in its Complaint was that PJM was wrongfully withholding the entirety of Affirmed's collateral because once PJM approved Affirmed's PIMV report for the 2023/2024

---

[50] *See id.* PP 29-30.

[51] *SEC v. Jarkesy*, 603 U.S. 109 (2024); *see generally FCC v. AT&T, Inc.*, No. 25-406, 2026 WL 1593357 (U.S. June 4, 2026).

Delivery Year, there was no longer any lawful basis for PJM to retain the collateral.[52] Moreover, Affirmed's argument in its Complaint was that there was *no* basis under PJM's tariff to find that Affirmed was an unreasonable credit risk to PJM.[53] At no point did Affirmed suggest an alternative argument that even if PJM could lawfully retain some of Affirmed's collateral (e.g., because Affirmed remained an unreasonable credit risk), PJM could lawfully retain only a more limited amount of collateral to secure against the risk Affirmed poses. Nor did it argue what that amount should be.

22. Under longstanding precedent, we do not consider arguments or new evidence raised for the first time on rehearing, subject to a narrow exception for matters that could not have been previously presented, e.g., claims based on information that only recently became available or concerns prompted by a change in material circumstances.[54] We have adopted this approach "because (1) our regulations preclude other parties from responding to a request for rehearing and (2) such behavior is disruptive to the administrative process because it has the effect of moving the target for parties seeking a final administrative decision."[55] We therefore find that Affirmed's newly raised argument on rehearing is procedurally barred.

---

[52] Complaint at 2; *see also id.* at 7; *id.* at 14, 17 (relief requested).

[53] *See id.* at 10-13 (arguing that the provision authorizing obtaining or retaining collateral where a market participant represents an unreasonable credit risk "is wholly inapplicable here" and, even if it "were in play, it is forward facing" and thus could not justify retaining the collateral); *id.* at 13 ("Affirmed does not conceivably present an 'unreasonable credit risk' to anyone with respect to capacity reductions that have already been delivered to PJM and that are in no way ongoing.").

[54] *See Ala. Power Co.*, 179 FERC ¶ 61,128, at P 15 (2022); *KEI (Me.) Power Mgmt. (III) LLC*, 173 FERC ¶ 61,069, at P 38 n.77 (2020); *Iroquois Gas Transmission Sys., L.P.*, 86 FERC ¶ 61,261, at 61,949 (1999)); *Ocean State Power II*, 69 FERC ¶ 61,146, at 61,548 (1994); *see also Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 554; *Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220, 1232-33 (D.C. Cir. 2024) (holding that the Commission permissibly declined to consider an argument on rehearing where that argument was not squarely raised in the complaint before the Commission); *NO Gas Pipeline v. FERC*, 756 F.3d 764, 770 (D.C. Cir. 2014) ("FERC regularly rejects requests for rehearing that raise issues not previously presented where there is no showing that the issue is 'based on matters not available for consideration . . . at the time of the final decision.'" (quoting 18 C.F.R. § 385.713(c)(3))); *Exxon Corp. v. FERC*, 114 F.3d 1252, 1260 (D.C. Cir. 1997); 18 C.F.R. § 713(c)(3).

[55] *Tex. E. Transmission, LP*, 141 FERC ¶ 61,043, at P 19 (2012) (internal citations and quotation marks omitted); *see Sw. Power Pool, Inc.*, 193 FERC ¶ 61,198, at P 61

23. Furthermore, Affirmed bears the burden of proof under FPA section 206.[56] The record is devoid of evidence to establish that a lesser amount of collateral would be sufficient to secure against the risk that PJM has determined Affirmed poses or, if so, what that amount would be, as Affirmed's vague request that the Commission direct PJM to release some unspecified "appropriate amount of the collateral" illustrates.[57] Affirmed thus failed to carry its burden of proof prior to rehearing and, even now on rehearing, has similarly failed to prove its case.[58] Rather, Affirmed's strategy is a misguided attempt to shift its burden to PJM and the Commission.[59]

24. But even setting all of that aside, Affirmed's claims are not meritorious for essentially the same reasons already discussed in the Complaint Order.[60] Affirmed

---

n.159 (2025) ("Allowing parties to introduce new evidence on rehearing also raises fairness and due process concerns because other parties are precluded from filing answers to requests for rehearing."); *see also U.S. v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (noting the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice"); *cf. Reytblatt v. U.S. Nuclear Regul. Comm'n*, 105 F.3d 715, 723 (D.C. Cir. 1997) (agencies are not required to respond to untimely comments).

[56] *See* Complaint Order, 195 FERC ¶ 61,044 at P 30 (citing 16 U.S.C. § 824e(b); *Shanker v. PJM Interconnection, L.L.C.*, 191 FERC ¶ 61,006, at P 31 (2025)).

[57] Rehearing Request at 15.

[58] Moreover, the Commission's practice, with which courts have agreed, is to reject arguments made on rehearing without sufficient specificity. *E.g.*, *ZEP Grand Prairie Wind, LLC*, 183 FERC ¶ 61,150, at P 10 (2023) ("The Commission's practice, with which courts have agreed, is to reject arguments made on rehearing without sufficient specificity." (quoting *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 25 (2023))); *Ind. Util. Regul. Comm'n v. FERC*, 668 F.3d 735, 736 (D.C. Cir. 2012) ("We dismiss the petition insofar as it challenges the order on grounds [petitioner] did not raise with sufficient specificity in its request for rehearing by the Commission.").

[59] *See, e.g.*, Rehearing Request at 13-14 ("[N]either PJM nor the [Complaint] Order make any attempt to explain the extent of any potential capacity deficiency resource charges that may result from the ongoing audits of Affirmed—or that the full $130 million of collateral is needed to secure any possible maximum charges. PJM holds excessive collateral to satisfy any audit conclusions and has failed to demonstrate otherwise.").

[60] *See* Complaint Order, 195 FERC ¶ 61,044 at PP 31-38.

contends that, as a result of the sunsetting of EERs' participation in PJM's capacity auctions, Affirmed will no longer have an "open position" with PJM, such that PJM's concerns about controlling risk are "stale."[61] But even if PJM's audit had been completed (and Affirmed provides no evidence that the audit has been completed), Affirmed ignores that the nature of the risk that Affirmed continues to pose was related to, *inter alia*, the potential for disgorgement resulting from the enforcement proceeding and Affirmed's admittedly thin capitalization—a risk that PJM, in its discretion, reasonably found has not subsided or been resolved.[62]

25. Moreover, Affirmed again misreads PJM's tariff collateral requirements as solely concerned with PJM's review and approval of Affirmed's PIMV report and any subsequent audits, particularly whether its assets performed as offered.[63] The Commission has already explained why Affirmed's view of PJM's tariff as requiring the return of the collateral after PJM's approval of the PIMV report was mistaken, and that the tariff allows PJM to consider the ongoing risks Affirmed poses.[64] Indeed, the issue in the enforcement proceeding was not simply whether Affirmed had offered some amount of capacity into PJM's auction and that its EERs had failed to perform as offered, but rather whether Affirmed's *entire participation* in that market was fundamentally invalid and fraudulent.[65]

<u>The Commission orders</u>:

Affirmed's request for rehearing is hereby granted in part and denied in part, as discussed in the body of this order.

By the Commission.

( S E A L )

---

[61] Rehearing Request at 12-13.

[62] *See* Complaint Order, 195 FERC ¶ 61,044 at P 34.

[63] *See* Rehearing Request at 13-14.

[64] *See* Complaint Order, 195 FERC ¶ 61,044 at PP 31-32 (explaining that the tariff requires PJM to determine that the risk for which it required the Restricted Collateral is no longer present before returning Restricted Collateral to the market participant, and finding that PJM reasonably concluded that it needed to retain the Restricted Collateral to protect against Affirmed's credit risks).

[65] *See* Penalty Order, 195 FERC ¶ 61,043 at PP 1, 11-12, 16.

Debbie-Anne A. Reese,
Secretary.

# EXHIBIT C

eCREDIT

Credit | Cash

Call us:1-866-400-898
Questions? E-mail credit_hotline@pjm.com
eCredit is provided by PJM Settlemen
PJM eCredit © 2026, All rights reserved

logout

Member Summary | Reports | Financials | PMA Summary | Contact Information

## Affirmed Energy LLC

Primary PJM Credit Contact: Credit Group - credit_hotline@pjm.com

| Credit Requirement | | Current Exposure | | Available Credit | | Credit Source | | Unallocated Credit | |
|---|---|---|---|---|---|---|---|---|---|
| Total | $0.00 | Current Unbilled Obligations * | $0.00 | FTR Allocated | $0.00 | Provided Cash Collateral | $135,987,815.07 | Collateral | $420,260.07 |
| FTR | $0.00 | Prior WE 07.22.2026 | $0.00 | RPM Allocated | $0.00 | Available Cash Collateral | $420,260.07 | Unsecured Credit Allowance | $0.00 |
| RPM | $0.00 | Two Prior WE 07.15.2026 | $0.00 | Available Market | $420,260.07 | Provided LC Collateral | $0.00 | RPM Seller Credit | $0.00 |
| Peak Market Activity(PMA) | $0.00 | BLIT Adjusted TCE | $0.00 | Working Credit Limit(WCL) | $315,195.05 | Available LC Collateral | $0.00 | | |
| | | RGL Adjustments | $0.00 | | | Provided Surety Bonds | $0.00 | | |
| | | Effect of RGL Adjustments | $0.00 | | | Available Surety Bonds | $0.00 | | |
| | | Effect of BLIT Adjustments | $0.00 | | | Minimum Collateral Reserve | $135,567,555.00 | | |
| | | | | | | CFTC LC Collateral | $0.00 | Unallocated Collateral Available: FTR | $420,260.07 |
| | | | | | | CFTC SB Collateral | $0.00 | Unallocated Collateral Available: RPM | $420,260.07 |
| | | * Actual DA/RT data through 07/29/2026 | | | | Unsecured Credit Allowance | $0.00 | | |
| | | * Preliminary DA/RT data through 08/01/2026 | | | | RPM Seller Credit | $0.00 | | |
| | | | | | | Tangible Net Worth - MCR | | | |
| | | | | | | Tangible Assets - MCR | | | |
| | | | | | | CFTC Net Worth | $500,100.00 | | |
| | | | | | | CFTC Total Assets | $147,754,645.00 | Collateral Returnable | $420,260.07 |
| | | BLIT Adjusted TCE Excess/(Deficiency) | $315,195.05 | | | | | Cash | $420,260.07 |
| PMA Excess/(Deficiency) | $420,260.07 | TCE early payment required | $0.00 | Available Market Credit for Virtual/CTS/Export Transactions | $0.00 | FTR additional collateral required | $0.00 | LC | $0.00 |
| PMA additional collateral required | $0.00 | TCE additional collateral required | $0.00 | Subject to virtual activity screen | Yes | RPM additional collateral required | $0.00 | SB | $0.00 |

next

next

### Accounts

Edit | Edit | Edit | Edit | Edit | Edit | Edit | Edit

| | WYLAN [30873] | AFFMDE [44806] | AFFMF1 [45508] | AFFMF2 [45509] | AFFMF3 [45510] | AFFMFW [45511] | AFFMF4 [46667] | AFFMCF [46668] |
|---|---|---|---|---|---|---|---|---|
| FTR credit requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Collateral | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Credit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Excess / (Deficiency) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| RPM Credit Requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Collateral | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Unsecured Credit Allowance | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| RPM Seller Credit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Credit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Excess / (Deficiency) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Virtual Transactions Allocation % | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Available Market Credit for Virtual Transactions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Virtual Transactions Credit Requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| CTS/Export Transactions Allocation % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Available Market Credit for CTS/Export Transactions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| CTS/Export Transactions Credit Requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Account Last Modified Date/Time | 06/16/2020 12:56:36 PM | 11/29/2017 09:21:34 AM | 06/10/2021 10:50:35 AM | 04/29/2021 10:59:40 AM | 06/10/2021 10:50:35 AM | 12/01/2025 05:00:51 PM | | 11/18/2019 02:10:52 PM |

**Foreign Guarantor BBB: N**

**Read Only: N**

**Family name: Affirmed Energy LLC**

Show Deficiencies | Submit All Changes | Cancel All Changes | Definitions | [+] FEEDBACK

Cash/LC data was last updated at
Other data was last updated at 08/03/2026 02:18:51 PM
Cash uploaded by PJM at 12/02/2024 03:32:25 PM

PJM eCredit Screenshot captured 08/03/2026 3:35pm

# EXHIBIT D

eCREDIT

Credit | Cash

Call us:1-866-400-8980
Questions? E-mail credit_hotline@pjm.com
eCredit is provided by PJM Settlement
PJM eCredit © 2026, All rights reserved

logout

Member Summary | Reports | Collateral Returns | Financials | PMA Summary | Contact Information | Officer Certification Form

## Affirmed Energy LLC

**Primary PJM Credit Contact: Credit Group - credit_hotline@pjm.com**

| Credit Requirement | | Current Exposure | | Available Credit | | Credit Source | | Unallocated Credit | |
|---|---|---|---|---|---|---|---|---|---|
| Total | $0.00 | Current Unbilled Obligations * | $0.00 | FTR Allocated | $0.00 | Provided Cash Collateral | $136,409,377.30 | Collateral | $841,822.30 |
| FTR | $0.00 | Prior WE 09.02.2026 | $0.00 | RPM Allocated | $0.00 | Available Cash Collateral | $841,822.30 | Unsecured Credit Allowance | $0.00 |
| RPM | $0.00 | Two Prior WE 08.26.2026 | $0.00 | Available Market | $841,822.30 | Provided LC Collateral | $0.00 | RPM Seller Credit | $0.00 |
| Peak Market Activity(PMA) | $0.00 | BLIT Adjusted TCE | $0.00 | Working Credit Limit(WCL) | $631,366.72 | Available LC Collateral | $0.00 | | |
| | | RGL Adjustments | $0.00 | | | Provided Surety Bonds | $0.00 | | |
| | | Effect of RGL Adjustments | $0.00 | | | Available Surety Bonds | $0.00 | | |
| | | Effect of BLIT Adjustments | $0.00 | | | Minimum Collateral Reserve | $135,567,555.00 | | |
| | | | | | | CFTC LC Collateral | $0.00 | Unallocated Collateral Available: FTR | $841,822.30 |
| | | | | | | CFTC SB Collateral | $0.00 | Unallocated Collateral Available: RPM | $841,822.30 |
| | | * Actual DA/RT data through 09/09/2026 | | | | Unsecured Credit Allowance | $0.00 | | |
| | | * Preliminary DA/RT data through 09/12/2026 | | | | RPM Seller Credit | $0.00 | | |
| | | | | | | Tangible Net Worth - MCR | | | |
| | | | | | | Tangible Assets - MCR | | | |
| | | | | | | CFTC Net Worth | $500,100.00 | | |
| | | | | | | CFTC Total Assets | $147,754,645.00 | Collateral Returnable | $841,822.30 |
| | | BLIT Adjusted TCE Excess/(Deficiency) | $631,366.72 | | | | | Cash | $841,822.30 |
| PMA Excess/(Deficiency) | $841,822.30 | TCE early payment required | $0.00 | Available Market Credit for Virtual/CTS/Export Transactions | $0.00 | FTR additional collateral required | $0.00 | LC | $0.00 |
| PMA additional collateral required | $0.00 | TCE additional collateral required | $0.00 | Subject to virtual activity screen | Yes | RPM additional collateral required | $0.00 | SB | $0.00 |

next next

**Foreign Guarantor BBB: N**

**Read Only: N**

**Family name: Affirmed Energy LLC**

### Accounts

Edit Edit Edit Edit Edit Edit Edit Edit

| | WYLAN [30873] | AFFMDE [44806] | AFFMF1 [45508] | AFFMF2 [45509] | AFFMF3 [45510] | AFFMFW [45511] | AFFMF4 [46667] | AFFMCF [46668] |
|---|---|---|---|---|---|---|---|---|
| FTR credit requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Collateral | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Credit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Excess / (Deficiency) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| RPM Credit Requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Collateral | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Unsecured Credit Allowance | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| RPM Seller Credit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Credit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Excess / (Deficiency) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Virtual Transactions Allocation % | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Available Market Credit for Virtual Transactions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Virtual Transactions Credit Requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| CTS/Export Transactions Allocation % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Available Market Credit for CTS/Export Transactions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| CTS/Export Transactions Credit Requirement | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Account Last Modified Date/Time | 06/16/2020 12:56:36 PM | 11/29/2017 09:21:34 AM | 06/10/2021 10:50:35 AM | 04/29/2021 10:59:40 AM | 06/10/2021 10:50:35 AM | 12/01/2025 05:00:51 PM | | 11/18/2019 02:10:52 PM |

Show Deficiencies | Submit All Changes | Cancel All Changes | Definitions | [+] FEEDBACK

Cash/LC data was last updated at
Other data was last updated at 09/14/2026 05:01:32 PM
Cash uploaded by PJM at 12/02/2024 03:32:25 PM